COBB COIN COMPANY, INC., a Florida corporation, et al., Plaintiff,

v.

The UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL, etc., Defendant.

No. 79-8266-Civ-JLK.

United States District Court, S.D. Florida.

Aug. 31, 1982.

See also, D.C., 525 F.Supp. 186.

**544**

David Paul Horan, Key West, Fla., for plaintiff.

Linwood Anderson, Harold Ward, Lloyd G. Bates, Miami, Fla., George Moss, Vero Beach, Fla., for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, District Judge.

The cultural heritage of the western world, the colonial appetite of the Spanish Empire, nearly three centuries of man's timeless quest for wealth and adventure, and the distribution of authority in the American Federalist legal system are all substantially intertwined in this litigation. This is an admiralty suit by a treasure salvor, Cobb Coin Company, to be declared owner in possession of a wrecked eighteenth century Spanish treasure galleon, or alternatively for an award for salvage services performed on the vessel. The vessel was carrying a king's treasure from the New World to Spain when it was wrecked, along with ten sister ships of the Spanish Plate Fleet, in a devastating hurricane in July 1715. The vessel came to rest on an expanse of sandy bottom under the Atlantic Ocean which, two hundred thirty-eight years later became for some purposes the undisputed sovereignty land of the State of Florida.

On August 17, 1979, the plaintiff Cobb Coin filed its complaint for a declaration of its rights in a wrecked vessel located "within 3,000 yards of a point [b]eginning at coordinates 27° 43.8′ N. latitude by 80° 22.8′ W. longitude." Three days later the plaintiff retrieved a cannon from the wreck site. On August 29, 1979, the State of Florida answered the complaint, and counterclaimed by asking this Court to declare it owner of the vessel and for restitution from the plaintiff for items it had salved. The State contends it owns all such wrecks within its territorial waters under its Archives and History Act, chapter 267, Florida Statutes (1979), and thereby has plenary authority to administer their salvage.

In the ensuing two and one-half years, Florida's executive branch attempted to enforce its archives and history statute, by arresting and attempting to prosecute the plaintiff's agents and employees from salving the wreck site, despite this court's prior assumption of jurisdiction over this admiralty action. In August, 1979, the Honorable Sidney M. Aronovitz, United States District Judge, denied the plaintiff's motion to enjoin the State in that effort, without prejudice to its right to reapply if the State's actions reached the level of bad-faith harassment. In October of 1979, the State moved to enjoin the plaintiff from working the subject site; the motion was denied for, *inter alia,* lack of irreparable injury as this court ordered the State's interest protected by the placement of its agents on board Cobb Coin's salvage vessel to catalogue the items salved. In June of 1981, the plaintiff Cobb Coin again moved for an injunction against State officers from enforcing the statute by continuing to threaten, and, in fact, arrest, the plaintiff's

salvaging crew. On July 7, 1981, this Court entered its temporary restraining order against the impermissible interference by state officers and attorneys with the ongoing jurisdiction of the federal admiralty court. Thereafter, following an eleven-day hearing, the Court entered a preliminary injunction against "[t]he agents, employees, and attorneys of the State of Florida, including but not limited to, any county sheriff or Florida Marine Patrol Officer, ... from interfering with the plaintiff's ongoing salvage operations or arresting the plaintiff's officers, agents, and employees." *Cobb Coin Co. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 525 F.Supp. 186, 220 (S.D.Fla.1981). This Court held a two day non-jury trial in this case at the United States Courthouse at Miami, Dade County, Florida, on June 16th and 17th, 1982. The parties relied in substantial part upon the evidence admitted in the eleven-day hearing on the motion for preliminary injunction and offered some additional evidence. The Court, upon consideration of the evidence and argument of counsel, hereby enters its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[1]

## I. FINDINGS OF FACT

For a number of years residents of the Florida East Coast and people interested in treasure hunting have known that the wrecks of the 1715 Spanish Plate Fleet are scattered beneath Atlantic waters near Florida's shoreline. The named defendant in this case consists of the remains of what is believed to be the Almiranta of the New Spain Group of the 1715 Plate Fleet, known to the Spanish by two names: San Christo del Valle and Nuestra Senora de la Concepcion. Tr. at 568 (hereinafter referred to as "Almiranta"). It lies some 100 feet from the shore off what once was Hugh "Papy" Corrigan's property, about 3½ miles north of Vero Beach midway between the Ft.

Pierce Inlet and the Sebastian Inlet. Early accounts of the various wrecks along the eastern coast were made as early as 1750, and evidence of their presence has surfaced periodically over the years. The city of Ft. Pierce Chamber of Commerce reportedly salvaged 16 cannons and three massive anchors from the area of the wrecks in the summer of 1928. A number of the cannons for years were displayed in public parks and even in front of a local sporting goods store; other cannons recovered were sold for scrap. *See* State's Exhibit No. 80. Gold coins have washed up upon the beaches near Ft. Pierce and Vero Beach since at least the early 1940's. *See* State's Exhibit No. 80. As early as 1958, various books and popular journals reported the story of the 1715 Plate Fleet, including the names and general locations of the ships wrecked, the cargo believed to be carried by, and the number of sailors lost on, each. *See* Joint Exhibits No. 27–30, and State's Exhibit No. 80. The Trustees of the Internal Improvement Fund of the State of Florida began entering into leases with treasure hunters for exploration and salvage of the wrecks in 1950. In 1958, the Trustees of the Internal Improvement Fund adopted for the first time formal restrictions governing salvage and treasure leases on state submerged lands. *See* State's Exhibit No. 80.

In the late 1950's, Mr. Kip Wagner, a house painter from Wabasso, Florida, became interested in identifying the source of silver "pieces of eight" which could be found on the beach between Sebastian Inlet and Ft. Pierce. Captain Steadman Parker, a resident of the area for over forty years had first pointed the coins out to Wagner. Wagner formed an association with a group of weekend scuba divers to search for more treasures on wrecks he knew were located somewhere off shore; that group became the Real Eight Salvage Co. In 1960 Real Eight obtained a nonexclusive lease from the Trustees of the Internal Improvement

---

1. This Court's October 2, 1981, Order Granting Plaintiff's Motion for Preliminary Injunction contains in greater detail the foundations of the legal conclusions entered herein. *Cobb Coin Co. v. The Unidentified Wrecked and Aban-* *doned Sailing Vessel*, 525 F.Supp. 186 (S.D.Fla. 1981). The reasoning of that order is hereby fully incorporated into and made a part of this Memorandum Opinion.

Fund to explore and salvage a 50-mile long, one-mile wide strip of submerged lands, 500 feet off shore, between the Sebastian Inlet to the south and the city of Stuart to the north. The Trustees extended the lease in 1961 for six years, and made it exclusive. That and subsequent leases entered by the State have provided that the Division of Archives and Records Management receive 25 per cent of the articles salved. Wagner and his group located and worked at least eight wreck sites from the 1715 fleet along the east coast, including the Corrigan's wreck site which is the subject of this litigation. *See States Exhibit No. 68.*

In the summer of 1963, Mr. Mel Fisher, owner of a scuba diving shop, came to Florida from California and became associated with Mr. Wagner and Real Eight. Mr. Fisher formed salvaging groups named Universal Salvage Co., Cobb Coin Co., and Treasure Salvors, Inc. Between October 1963 and August, 1972, Mr. Fisher's companies and Real Eight worked some of the sites of 1715 wrecks pursuant to various agreements, under authority of Real Eight's State leases. Under these agreements, they divided their recoveries 50–50 after deducting 25 percent for the Division of Archives and Records Management. The combined effort yielded large quantities of gold, silver, and other valuable artifacts.[2] *See* Plaintiff's Exhibits No. 8 and 9 and State's Exhibit No. 68. Although the State's archivists admit to having received these artifacts, none could testify with certainty what the State now has, nor are there any records of precisely which of the artifacts it received came from the Corrigan site or other wrecks of the 1715 Fleet. *See State's Exhibit No. 68.* Real Eight terminated its contract with Fisher's company in 1972. At that time, Mr. Fisher was apparently devoting more of his attention to the search for the treasures of the Atocha and Santa Margarita, which sank in 1622 40 miles west of

Key West. Mr. Fisher testified that he gave up on the east coast wrecks because the State officials were slow in sending field agents to accompany salvage vessels and in returning the salvors their share of the recovery. Real Eight Co. retained the exclusive lease with the State and relinquished it voluntarily in October, 1977. The State then issued a lease on the Corrigan site to the Quest Corporation, an intervening claimant in this suit. Quest still holds the lease purporting to give it the exclusive right to search and explore the water over the Corrigan wreck site.

The full record of evidence adduced at the eleven-day hearing on the plaintiff's motion for a preliminary injunction, which was admitted into evidence by agreement of all parties at the trial on the merits, shows that Quest actually went out to the Corrigan site for either exploration or diving forty-nine (49) days during the first two years it held the State lease. *See* testimony of Mr. Charles Kenworthy, Tr. at 165–169. Mr. Kenworthy testified that he searched the area by "remote electronic work," including satellites, when they were not diving on the site. His employees, however, testified that they never used satellites to search the area. *See* Tr. at 881, 889–90. Quest's employees also testified that, during the time Quest held the lease on the Corrigan site, its captains chose to work other sites in the area, consciously ignoring Corrigan's site regardless of the relative salvaging conditions at either site. *See* testimony of Mr. James Ryan, Tr. at 813, and Mr. Randy Lathrop, Tr. at 898 (Quest ignored Corrigan's "four out of five times.") It is clear from the testimony that while it held the lease, Quest was less interested in Corrigan's than in a site north thereof, "E–56", on which Quest held an "exploratory lease." Tr. at 880.

Mr. Kenworthy stated that his company recovered sixteen (16) silver coins from Cor-

---

2. Under the State lease, the salvors sent the State Division of Archives, History, and Records Management the entire find, and the Division and lessee later divided the find in a "trading session." They used a point system to quantify the value of the different types of

artifacts. For example, a cannonball was worth one (1) point, an eight reale was worth between five and 20 points, and an Eight Escudo was worth about 350 points. *See* State's Exhibit No. 68.

rigan's in its two years of salvage under the exclusive State lease. Tr. at 92. The State's representative testified that Quest found nine (9) coins. The coins were turned over to the State for safekeeping; they have since disappeared.

On August 17, 1979, when the plaintiff, Cobb Coin Co. Inc., filed its admiralty complaint in this Court, Quest was not working the site. Mr. Mel Fisher, the President of Cobb Coin Co., notified the United States Marshal that he intended to retrieve a cannon from the Corrigan site on August 20, 1979. Quest's salvors testified that when they arrived at the dock on August 20 there was great excitement over the expected arrival of "other salvors" who were coming to "take over [Quests's] site." Testimony of James Ryan, Tr. at 882. Two State Agents were on board Quest's salvage boat when they left the dock that day, and, instead of turning northward to E–56 as they generally did, Quest went south to Corrigan's wreck site. A diver for Quest testified that they watched a boat come into view, put what he believed to be a magnetometer over the water and make several passes, when a second boat arrived, anchored, put divers into the water, and retrieved a cannon in about 15 minutes. It is this cannon turned over to the United States Marshal by Cobb Coin, that is asserted as the basis for *in rem* jurisdiction in Federal Court.

Since August of 1979, Cobb Coin has worked the wreck site in question as diligently as can be expected considering the natural salving conditions and the State's attempts to stop its efforts. Cobb Coin worked the Corrigan site the few days that remained in the 1979 salvage season after this suit was filed, thirty (30) days in 1980, and a total of 56 vessel-days in 1981. *See* State's Exhibits No. 26 and 67, Plaintiff's Exhibit No. 31, and Tr. at 784. The evidence indicates that the vessels were unable to work due to unfavorable conditions approximately as many days as they were able

to work. *Id.* The claimants offered no evidence that Cobb Coin failed to work the site diligently, given the prevailing conditions. The 1982 salvage season began in June; Cobb Coin did not introduce any evidence as to its 1982 salvage efforts.

Cobb Coin Co. Inc., during the period it has worked the Corrigan site since filing this suit, has successfully retrieved several artifacts of treasure and of historic and archeological value. During the brief 1979 salvage season, Cobb Coin retrieved only pottery fragments, ballast stones, nails, and the cannon; it found "no high value items" such as gold or silver. Tr. at 275. In 1980, the plaintiff recovered 734 individual silver coins, two gold discs, 10 clumps of inseparable silver coins, and 300 pieces of "encrusted objects." In 1981, it recovered 25 or 30 "encrusted objects," 300 silver coins, and 12 Royal Eight Escudo gold coins. The Royal Eight Escudos are in "fairly good shape." Tr. at 806. Many of the silver coins are pieces of eight, minted in 1713; the value of one is now estimated at $500.00 to $600.00. The value of a Royal Eight Escudo is estimated to range between $5,000.00 and $12,-000.00, depending on the quality of the coin. Tr. at 806.

These Findings of Fact provide the general background for an understanding of the history of this wreck. As the section below applying the governing law indicates, the events occurring prior to 1977 at the wreck site are immaterial to the determination of the parties' rights in this suit. Briefly, this Court holds that under the maritime law, the unnamed, wrecked, and abandoned sailing vessel believed to be the Almiranta, and her tackle, armament, etc., was in a state of abandonment when the plaintiff filed this suit and reclaimed the cannon from the wreck site. There is no need to determine what interest any of the plaintiff companies[3] acquired or failed to acquire during the period between 1960 and

3. The plaintiff Cobb Coin Co. purports to represent the interests of all other entities with which Mr. Fisher's groups worked the Corrigan's wreck site in the 1960's and 1970's under the various State leases, by virtue of assign-

ments executed and made a part of this record. *See* Plaintiff's Exhibit No. 37. There is no need to determine what effect these assignments may have.

**548**

1977; all have abandoned any possible claim to this wreck under the law of finds. Further, the plaintiff, Cobb Coin Company, Inc., and its purported assignors, waived any right to seek a salvage award in the admiralty court for pre-1979 recoveries by conducting their operations under the above-mentioned, indisputably valid, leases with the State of Florida.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this case on the basis of the admiralty and maritime jurisdiction, 28 U.S.C. § 1333.

■ 2. This Court has jurisdiction *in rem* over the artifacts which have actually been brought up and turned over to the United States Marshal. The Court also has maritime jurisdiction based on *in personam* principles to adjudicate disputes between competing salvors or claimants who have made their interests known by answering the admiralty complaint. Finally, the Court has *in rem* jurisdiction, coupled with *in personam* jurisdiction over the claimants, to dispose of all articles brought up from the site of this wreck from the inception of the lawsuit.[4] *Cobb Coin,* 525 F.Supp. at 194–97.

■ 3. This case is governed by the federal maritime law of salvage, not the Florida Archives and History Act, § 267.-031, .061, .10, .12, .13, and .14, Fla.Stat.Ann. (West Supp.1982), and the regulations promulgated thereunder, Fla.Admin.Code Rules 1A–21.01 *et. seq.*

■ a. In an admiralty action in the federal district court, state legislation that conflicts with federal maritime principles cannot be given effect under the supremacy clause of the United States Constitution, article VI, clause 2. *Cobb Coin,* 525 F.Supp. at 201, *citing Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1916). *See* discussion in *Cobb Coin,* 525 F.Supp. at 200–13.

b. Congress has largely left to the courts the responsibility for fashioning the rules of admiralty law, so the principles governing the instant admiralty action derive from rules developed by the American Admiralty Courts. *Cobb Coin,* 525 F.Supp. at 201; citing *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 405, 90 S.Ct. 1772, 1790, 26 L.Ed.2d 339 (1970).

■ c. An *in rem* action for a salvage award against artifacts recovered from the remains of a centuries-old shipwreck states a claim within this Court's admiralty jurisdiction, governed by the judicial law of finds or doctrine of maritime salvage. *Cobb Coin,* 525 F.Supp. at 203, *citing Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir.1978) (*Treasure Salvors I*).

■ d. Florida's statutory and regulatory framework for the exploration, recovery, and disposition of sunken historic artifacts is inconsistent with federal maritime principles in at least three material respects:

1) Florida law requires that one obtain a state license to be able to explore the navigable waters for abandoned or derelict property, in contravention of the maritime principle that potential salvors or finders are free to search and explore the open waters for salvageable sites. *Cobb Coin,* 525 F.Supp. at 203–04.

2) Florida law permits a state licensee the exclusive right to salve an area regardless of the licensee's diligence or success, whereas the law of maritime salvage or finds protects a salvor's right to uninterrupted possession of a project only where the salvor exercises due diligence and is reasonably successful in saving the subject property. *Cobb Coin,* 525 F.Supp. at 204–07.

3) Florida's system of fixed salvor compensation conflicts with the flexible maritime law's flexible method of remuneration based on risk and merit. *Cobb Coin* 525 F.Supp. at 207–08.

---

4. Of course, the Court may need to determine the interests of competing salvors who intervene, whose activities may have begun prior to the time a plaintiff filed suit.

4. No federal statute or governing legal principle requires this Court to apply state law or any law other than the law of maritime salvage.

a. The federal interest having a uniform law govern the rights of maritime salvors outweighs the federalism considerations that ordinarily call for every presumption in favor of enforcing state statutes, where uniformity serves to apprise salvors of governing standards regardless of a wreck's location, where the subject matter of the statute is not "peculiarly a matter of state and local concern," *Cobb Coin,* 525 F.Supp. at 209–11.

b. Florida's salvage framework is not merely an exercise of the state's police power which affects maritime concerns or creates a remedy for the enforcement of existing federal rights; it interferes with substantial existing federal maritime rights. *Cobb Coin,* 525 F.Supp. at 211–13.

c. The Submerged Lands Act of 1953 does not grant the State of Florida such authority over historic artifacts within its three-mile territorial boundary as to supercede federal maritime jurisdiction over an application of federal principles to traditional claims by finders or salvors. *Cobb Coin,* 525 F.Supp. at 213–16.

5. This action is not barred by the Eleventh Amendment. At various times throughout these proceedings, and again in its post-trial memorandum, the claimant State of Florida has argued that this action is barred by the Eleventh Amendment to the United States Constitution. In granting the plaintiff's motion for a preliminary injunction against the State's officers, agents, and employees, this Court held that the instant admiralty action is not so barred. In the intervening time period, the United States Supreme Court decided *Florida Department of State v. Treasure Salvors, Inc.,* —— U.S. ——, 102 S.Ct. 3304, 73 L.Ed.2d 1057, (1982), on a writ of certiorari to the United States Court of Appeals for the Fifth Circuit to determine "Whether the Eleventh Amendment to the United States Constitution Bars an in rem Admiralty Action Seeking to Recover Property Owned by a State." *Id.* at ——, 102 S.Ct. at 3313. The Court answered a narrower question. The majority held that the Eleventh Amendment did not bar the issuance of process against named State officials by a United States District Court to secure possession of artifacts held by those State officials. The Supreme Court decision in *Treasure Salvors* does not disturb this Court's ruling that the instant action is not barred by the Eleventh Amendment.

The question decided by the Supreme Court arose out of an action which is similar to this one in the general sense that the plaintiff filed an "admiralty *in rem* action in federal court, seeking a declaration of title to an abandoned sailing vessel that had been discovered on the ocean floor." *Id.* at ——, 102 S.Ct. at 3318. In *Treasure Salvors,* the plaintiff sought to be put into possession of a Spanish treasure galleon believed to be the Atocha, which sunk in 1622, and to have title confirmed in it against all claimants and all the world. At the time the artifacts recovered were either in Treasure Salvors' possession or were held by State officials in Tallahassee pursuant to agreements which had been entered into between the Division of Archives and History and Records Management and the plaintiff. Items recovered from the Atocha in Treasure Salvors' possession were served with process and brought into the custody of the Court; most of the wreck and its cargo remained buried in the sand beneath international waters. When the Fifth Circuit Court of Appeals entered a judgment in favor the Treasure Salvors[5] on the ground that Florida had no claim to a wreck outside its boundary, Treasure Salvors filed a motion in the district court for an order commanding the United States Marshal to arrest and take custody of the artifacts held by State officials in Tallahas-

**5.** The Fifth Circuit modified the Order of the District Court which confirmed Treasure Salvors' title "against the United States of America and all other claimants," so as to operate only against the claimants who appeared to dispute Treasure Salvors' ownership—the United States. *Treasure Salvors I,* 569 F.2d at 336, and n. 8.

see and bring them within the jurisdiction of the Court. The Court issued the warrant to arrest the items, *see id.* at —— n. 10, 102 S.Ct. at 3311 n. 10. The State of Florida moved to quash the warrant and the District Court then issued an order to show cause why the State should not deliver the artifacts into the custody of the Marshal. In response to the order to show cause the State raised a number of substantive issues including its Eleventh Amendment defense. The district court held that "the Eleventh Amendment did not bar the seizure of the artifacts and subsequent transfer to the custody of the Marshal." *Id.* at ——, 102 S.Ct. at 3313, citing 459 F.Supp. 507 at 527. The Court of Appeals for the Fifth Circuit affirmed, holding that the Eleventh Amendment did not prevent the Court from resolving the controverted claims to the ownership of the *res,* since resolution of that dispute was essential to a determination of whether the Eleventh Amendment in fact barred an exercise of jurisdiction by the federal court. —— U.S. at ——, 102 S.Ct. at 3312 citing 621 F.2d 1340 at 1345 (5th Cir.).[6]

The United States Supreme Court affirmed the judgment of the Court of Appeals in part and reversed it in part. A plurality of Justices held that the "federal court had jurisdiction to secure possession of the property from the named State officials, since they had no colorable basis on which to obtain possession of the artifacts." —— U.S. at ——, 102 S.Ct. at 3313. The plurality held, however, that "the Court did not have power ... to adjudicate the State's interest in the property without the State's consent." *Id.* Mr. Justice Brennan, concurring in part and dissenting in part, cast the deciding vote and affirmed the judgment on the ground that the Eleventh Amendment does not bar a federal court suit against a State when brought by a citizen of that State. He therefore disagreed that the Court of Appeals was precluded from deciding the question of the

State's ownership. Four justices concurred in the holding that it was improper to decide the State of Florida's interest without the State's permission. They dissented on the Eleventh Amendment question, however, on the bases that (1) the suit was against the State and (2) the plaintiff's contract with the State, having been entered pursuant to a statute whose validity was not questioned, "provided a colorable basis upon which the [State's] agents could hold the property." *Id.* at ——, 102 S.Ct. at 3323–24 (White, J. concurring in part and dissenting in part).

Eight justices agreed in *Treasure Salvors* that where a warrant of arrest *in rem* is directed at officers of a state for the return of public property in the officers possession, the Eleventh Amendment prevents a federal court from deciding the question of the State's ownership if the State does not consent to that determination.

This court concludes that a determination of the plaintiff's rights in the instant action is not barred by the Eleventh Amendment because (1) the suit is not against the State or against the officers of the State and seeks a permissible form of recovery; and (2) that if it is deemed a suit against the State, Florida has either consented to this Court's determination of its ownership interest by its actions in the lawsuit and is bound thereby, or must be dismissed as a claimant and left to its remedies in some other forum.

■ The plurality opinion in *Treasure Salvors* established that the Eleventh Amendment issue requires an answer to three specific questions:

(a) Is th[e] action asserted against officials of the State or is it an action brought directly against the State of Florida itself? (b) Does the challenged conduct of state officials constitute an *ultra vires* or unconstitutional withholding of property or merely a tortious inter-

---

**6.** Many details of the proceedings in the District and Circuit Court in *Treasure Salvors* are omitted in this analysis and are available in the opinions of the respective courts and of the

Supreme Court. This Court only repeats the facts that bear on the Eleventh Amendment question.

ference with property rights? (c) Is the relief sought by [the Plaintiff] permissible prospective relief or is it analogous to a retroactive award that requires "the payment of funds from the state treasury"?

*Treasure Salvors,* —— U.S. at ——, 102 S.Ct. at 3318. Presumably, the second question is immaterial if the state officials are not named defendants.

▮ a. This is not a suit against the State or its officers. The plaintiff Cobb Coin Co. filed its *in rem* complaint invoking the admiralty jurisdiction of the United States District Court in August of 1979. This action is not against any State officers or against the State itself; it is an action in which the plaintiff seeks to have his federal rights under the general law of finds or the maritime law of salvage decided as to these artifacts which were admittedly beneath navigable waters.[7] It is "against" property which lay untouched and, from a legal standpoint, undiscovered before the plaintiff began this suit. The wrecked and abandoned sailing vessel is not in the possession of the State or any of its officers.[8] The complaint asks that the plaintiff be declared owner in possession of the wrecked Spanish treasure galleon or, alternatively, for an award for salvage services performed on the vessel, her tackle, armament, apparel, and cargo.[9]

▮ The case is premised, in part, on an *in rem* action against the items which the plaintiff has brought up from the ocean to be declared finder or for an award as salvor.[10] An *in rem* action of this nature

7. During the pendency of this suit, a number of artifacts have been salved from the defendant wreck site; they have been turned over to the United States Marshal pursuant to this Court's order.

8. This is the case with respect to the "prospective" aspect of the plaintiff's suit. The Complaint also asks that the plaintiff be put in possession or be declared owner or receive a salvage award for artifacts recovered before it filed this suit. Clearly, some of these are in the possession and control of the State's officers. See Section I, supra. For the reasons explained in Section IIIB. of this Order, *infra,* the holding herein does not extend to artifacts recovered prior to the institution of this suit.

9. The State conceded at the trial that the defendant was "abandoned," and the plaintiff obviously agrees with that characterization. Whether the wreck is "abandoned" is a question of law for this Court to decide, and this Court holds that the defendant was abandoned on the date the plaintiff filed its Complaint. See *infra.* It is noteworthy, however, that the State does not dispute this matter.

10. The specific action under review in *Treasure Salvors,* the warrant for return of property, was directly one against officers of the State of Florida. It sought to recover artifacts in their possession which the State contended were public property being used for a legitimate governmental purpose, i.e., the preservation of cultural, historical and archeological artifacts. Here, the property claimed by the plaintiff in the prospective portion of its Complaint is neither in the State's possession nor public property used and employed for governmental purposes.

Even the Justices who dissented on the Eleventh Amendment question in *Treasure Salvors* agreed that to be barred the property allegedly immune from suit must be "in the possession and ownership of the State ...." —— U.S. at ——, 102 S.Ct. at 3326 (White, J., concurring in part and dissenting in part). Therein, Mr. Justice White states:

In re New York (I) [256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057] indicates that the Eleventh Amendment will bar a suit that has the effect of proceeding against a State officer and involving the State's property. *In re New York (II)* [256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063] squarely stands for the proposition that sovereign immunity bars process against a *res* in the hands of State officers. This is true even though an *in rem* action strictly proceeds against the vessel and the owner of the vessel or artifacts is not an indispensible party. Significantly, *In re New York (II)* did not distinguish between the service of process to arrest the *res* and the thrust of the libel itself to determine the rights in the vessel. I follow that course in this case and refuse to sever the attempt to arrest the artifacts from the attempt to decide their ownership.

*Id.* As for the first part of Mr. Justice White's analysis, it is clear that the element of possession contemplated by the *In re New York* theory is absent here. To the extent Mr. Justice White is concerned that an *in rem* decree implicitly decides the ownership of the items pursued *in rem,* the cases cited in his opinion reveal that the State's mere assertion of ownership does not absolutely bar a suit regarding the items. It is clear that the property must not only be owned by the State but must be used and employed for public and governmen-

states a claim within this Court's admiralty jurisdiction. *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel,* 614 F.2d 1051, 1055 (5th Cir.1980) citing *Treasure Salvors, Inc., v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir.1978) (*Treasure Salvors I* ). The complaint also states a claim to the protection of the Court for a continued right to bring home the property found. *Treasure Salvors, Inc., v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560, 567 (1981) (*Treasure Salvors III* ). As is discussed below, the complaint may, and in this case does, state a complete claim for relief under the law of salvage. No determination of the State's ownership is necessary in the determination of the plaintiff's rights under federal law.[11]

As this Court stated two years ago in a similar case, the State's Eleventh Amendment argument misconstrues the nature of the protection to which it is entitled as a sovereign. The State simply has not been sued here; it has voluntarily undertaken to enter this otherwise complete litigation. This suit is not against the State and is not barred by the Eleventh Amendment.

 There is an equally compelling, alternative reason why this action is not against the State of Florida. Whether an action is one against the State is determined by reference to State law. *Aerojet-General Corp. v. Askew,* 453 F.2d. 819, 828 (5th Cir.1971), citing *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 463, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). The law of Florida is that an action for relief from

---

tal purposes. *In re New York,* 256 U.S. 503, 511, 41 S.Ct. 592, 593, 65 L.Ed. 1063 (1921). ("The principle so uniformly held [is] to exempt the property of municipal corporations employed for public and governmental purposes from seizure by admiralty process *in rem,* [and] applies with even greater force to exempt public property of a State used and employed for public and governmental purposes.")

Mr. Justice White cites the *In re New York* cases as "particularly forceful because they reflect the special concern in admiralty that maritime property of the sovereign is not to be seized." —— U.S. at ——, 102 S.Ct. at 3327. Footnote 5, elaborating on that point, states: "Under English law, no warrant for arrest will issue against any vessel in the *actual service* of a recognized foreign government." *Id.* nn. 5, 7. (emphasis added). Thus, the concerns expressed by the dissenters on the Eleventh Amendment question do not undermine the Court's assumption of jurisdiction in this case. As this Court held in its order granting plaintiff's motion for preliminary injunction:

Even were the State to 'own' the sunken historical artifacts under its statute and the Federal Submerged Lands Act ... the Eleventh Amendment would still pose no bar to this suit, as the objects here at issue are not sovereign property in the sense contemplated in the relevant cases. The Supreme Court in the *Queen City* exempted seizure in admiralty of 'public property of a State used and employed for public and governmental purposes.' 256 U.S. at 511, 41 S.Ct. at 593. *See also* The *Fidelity,* Fed. Case No. 4, 758, 8 Fed. Case 1189, 1191 (1897) ('Property does not necessarily become a part of the sovereignty because it is owned by the sovereign. To make it so it must be devoted to the public use and must be employed in carrying on the

operations of the government,' citing *The Davis,* 10 Wall 15, 77 U.S. 15, 19 L.Ed. 875 (1869)).

*Cobb Coin,* 525 F.Supp. at 199. As this Court stated in October, "it is hard to view the items before the Court as public property used and employed for governmental purposes when they have lain serenely in their two hundred sixty-plus year habitat, with the State having only recently taken mere verbal action to claim (and no positive steps of its own to locate or raise) these artifacts from the ocean bottom." *Id.*

11. This Court is in substantial agreement with part of Judge Bunton's opinion in *Platoro Ltd. v. The Unidentified Remains of a Vessel,* 518 F.Supp. 816, 819–20 n. 1 (W.D.Tex.1981):

It is the Court's impression at this time that the State's intervention in this suit has been misconceived ab initio; the State of Texas, by claiming title by sovereign prerogative, has ignored the fact that the British common law doctrine of sovereign prerogative has been absorbed into the law of admiralty; the courts sitting in admiralty take the res into their registries, as did the British sovereign, and disburse the expense for salvage and other costs concerning the res as they are claimed or incurred. The State of Texas has tried relentlessly to divest this court of its admiralty jurisdiction by asserting its claims of sovereignty. This effort misconstrues the laws of admiralty.

Here, Florida's sovereign prerogative claim is made pursuant to an express statutory pronouncement, not the common law theory. It nevertheless equally "misconstrues the laws of admiralty."

actions of a State agency which violate the constitution is not "a suit against the State" such as would be barred by the doctrine of sovereign immunity.[12] *State Road Dep't. v. Tharp*, 146 Fla. 745, 1 So.2d 868 (1941). The rule regarding sovereign immunity is direct support for determining what constitutes a suit against the State for Eleventh Amendment purposes. *Treasure Salvors,* —— U.S. at —— n. 4, 102 S.Ct. at 3326 n. 4 (White, J., concurring in part and dissenting in part). Although the Florida statutory framework purporting to vest ownership of these artifacts in the State and establishing a framework for governing their salvage is not unconstitutional on its face, this Court observed in its order granting the plaintiff's motion for preliminary injunction, and holds here, that to the extent the statute conflicts with the exercise of one's federal rights, it is ineffective. *See Treasure Salvors, Inc., v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 459 F.Supp. 507,

524, 527 (S.D.Fla.1978). To repeat briefly the Court's holding regarding the effectiveness of the Florida Statute in this proceeding, it is not valid in this admiralty suit to the extent it "works material prejudice to the characteristic features of the general maritime law." As the Court noted in its earlier order the Florida statute is inconsistent with the paramount maritime law of salvage in at least three respects: (1) it limits the right to explore navigable waters to search for salvageable sites to its licensees; (2) it permits "salvors" to work a site exclusively notwithstanding a lack of diligence or success; and (3) it provides a fixed method of compensation in contrast to admiralty's flexible method of remuneration based on risk and merit. *See Cobb Coin,* 525 F.Supp. at 203–08. Therefore, this salvage action in admiralty is not a suit against the state, under the rule of *Tharp,* where Florida's claim is basically preempted by the supreme federal law of admiralty.[13]

**12.** The State argues that there can be no suit against it unless manifested by consent by provision of general law. Section 13 of Article 10 of the Florida Constitution so provides, but so did Section 22 of Article 3 of the Florida Constitution in effect at the time of the *Tharp* decision. *See* 1 So.2d at 869. Thus *Tharp* is a recognized exception under Florida law defining what constitutes a suit against the State for purposes of sovereign immunity and, it follows, for purposes of the Eleventh Amendment.

**13.** All of the Justices in *Treasure Salvors* agreed that at least as regards a suit against State officials, "State officials cannot evade responsibility when their conduct 'comes into conflict with the supreme authority of the Constitution'." —— U.S. at ——, 102 S.Ct. at 3324 (White, J., concurring in part and dissenting in part), citing *Ex Parte Young,* 209 U.S. 123, 159, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908). This rule is premised on the theory that "conduct of a state officer taken pursuant to an unconstitutional state statute is deemed to be unauthorized and may be challenged in federal court." *Treasure Salvors,* —— U.S. at ——, 102 S.Ct. at 3321, citing *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 701, 69 S.Ct. 1457, 1467, 93 L.Ed. 1628 (1949); it is deemed not an action of the sovereign.

There is federal jurisdiction to adjudicate an allegedly unconstitutional taking of property by a State where there is no other remedy by which the plaintiff may recover compensation for the taking. *Treasure Salvors,* —— U.S. at —— n. 13, 102 S.Ct. at 3330 (White, J., concur-

ring in part and dissenting in part). Here, the State law purports to supercede the plaintiff's federal rights under the maritime law of salvage. Yet, the plaintiff has no recourse to the courts of Florida to enforce its federal rights; Florida courts will not assume jurisdiction to determine a salvage award. *O'Neill v. Schoenbrod,* 355 So.2d 440 (Fla. 3d DCA 1978). *See also Cobb Coin,* 525 F.Supp. at 214. Thus, the state court remedy available in cases cited by the *Treasure Salvors* dissent, —— U.S. at —— n. 13, 102 S.Ct. at 3330, is unavailable to this plaintiff.

Thus, to paraphrase a landmark decision of Eleventh Amendment jurisprudence, "If a suit against officers of a State to enjoin them from enforcing an unconstitutional statute … be not one against the State," it is impossible to see how a suit which states a complete claim for relief under federal law but which a State feels derogates its statutorily announced ownership, where the State's claim is based upon authority superceded by paramount federal principles, can be deemed a suit against the State. See *Treasure Salvors,* —— U.S. at ——, 102 S.Ct. at 3314–15, *quoting Tindal v. Wesley,* 167 U.S. 204, 222, 17 S.Ct. 770, 777, 42 L.Ed. 137 (1897) ("If a suit against officers of a State to enjoin them from enforcing an unconstitutional statute … be not one against the State, it is impossible to see how a suit against the same individuals to recover the possession of property belonging to the plaintiff and illegally withheld by the defendants can be deemed a suit against the State.")

554

■ b. The recovery sought is consistent with the requirements of the Eleventh Amendment. Where an action is directed at state officials to challenge unconstitutional or *ultra vires* conduct, it is permissible only if it seeks prospective relief and not relief analogous to a retroactive award that requires "the payment of funds from the state treasury." *Treasure Salvors,* —— U.S. at ——, 102 S.Ct. at 3318. Actions against state officials have been barred where, because the ultimate recovery nonetheless was borne by state taxpayers, the suits were deemed actions against the State itself. The instant action is neither against the State of Florida nor any of its officials, as noted above. Further, any award to the plaintiff would be in the form of artifacts it recovered from the ocean, not the payment of funds from the State treasury.

■ Indeed, the plaintiff's recovery here will not be in the form of money at all. As indicated in the Court's October 2, 1981 order, the appropriate award for the finding or salvage of such artifacts as those at issue here, items uniquely and intrinsically valuable beyond their monetary worth, is an award *in specie,* i.e. the artifacts themselves. An award of "artifacts which had been lost in the ocean depths for over two hundred and sixty-four years, and which, but for the plaintiff's considerable efforts, would otherwise have remained unknown to the terrestrial world," *Cobb Coin,* 525 F.Supp. at 198, does not derogate the fiscal integrity of the State of Florida, and as such is not barred by the Eleventh Amendment.

■ c. If this action is considered an action against the State, Florida has consented to a determination of its rights by intervening in this lawsuit and subjecting its ownership claim for the Court's adjudication. As the Court in *Treasure Salvors* stated, a federal court may adjudicate the State's right to property to which the State voluntarily advances a claim. —— U.S. at ——, 102 S.Ct. at 3322. Although the State of Florida has nominally asserted its "Eleventh Amendment immunity," it has voluntarily appeared in this lawsuit, asked

the Court to adjudicate its rights, and conducted extensive litigation on over 30 different issues it claims defeat the interests asserted by the plaintiff including that Florida owns the wrecked vessel and the artifacts. Initially, the State of Florida actually and expressly subjected the question of its ownership to the Court for determination when it answered the complaint and filed its counterclaim on August 30, 1979. Its counterclaim asserted:

3. The STATE is owner of the unnamed wrecked vessel that may be the object of this action, including its armament, apparel, tackle, or cargo.

4. The unnamed wrecked vessel, its armament, apparel, tackle, are abandoned, wrecked or derelict property and should be declared the property of the STATE.

5. The STATE is sole owner of such vessel, her armament, apparel, tackle and cargo.

6. The vessel, her armament, apparel, tackle and cargo are treasure trove artifacts or such objects which have intrinsic or historical and archeological value and which have been abandoned on STATE-owned sovereignty submerged lands and belong to the State of Florida.

. . . .

8. No other person is in rightful possession of the vessel, its armament, apparel, tackle and cargo.

Wherefore, Plaintiff respectfully requests:

1. That this Honorable Court issue a declaratory judgment that the State of Florida is the sole owner of the Defendant Unnamed Wrecked and Abandoned Sailing Vessel, its equipment and cargo and,

2. That Plaintiff be ordered to deliver and make restitution to the State of Florida for any part of the unnamed wreck, its cargo and equipment in Plaintiff's possession.

Intervenor's Answer to Complaint in Admiralty and Counterclaim filed August 30, 1979, File No. 9.

Nearly one year after it filed its Answer and Counterclaim, Florida attempted to hedge its position through various pleading devices. After eleven months the State filed its "restricted claim of owner" in which it stated that it was appearing "without waiving its sovereign immunity or admitting any jurisdiction in this Court, [and] request[ed] the Clerk to note the restricted appearance of its attorneys undersigned as authorized under Supplemental Rule E(8), Fed.Rules of Civil Procedure." [14] Therein, however, it again alleged "that it is the sole owner of Defendant property arrested herein . . . ." One month after filing its "restricted claim of owner," the State moved to dismiss its counterclaim.[15] Contrary to the State's contentions, these devices were ineffective to circumscribe this Court's ability to decide the State's interest in the artifacts. Florida's pleadings attempted, in effect, to get the Court either to hold that Florida owns the wrecked galleon and its treasures, or to dismiss the suit as being one against the State. The State cannot have it both ways; it is either in the suit as a claimant subjecting its rights to decision or else it is out of the suit altogether. *See Treasure Salvors,* —— U.S. at —— n. 20, 102 S.Ct. at 3314 and at 5065, citing *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978).

The State's procedural attempts to limit the Court's ability to determine its ownership are ineffective for a second reason.

They occurred nearly one year after the State sought several forms of affirmative relief from this Court. Less than one month after filing its counterclaim, the State moved for a preliminary injunction against the plaintiff's continued salving of the defendant wreck site under the Court's jurisdiction. That affirmative relief was denied by the Court and the State did not appeal the order of denial. In the eleven months between the time the State sought an injunction and the time it tried to "restrict" its claim, and in the subsequent two years, the State's attorneys engaged in extensive motion practice and discovery; its officers so vigorously attempted to enforce its laws against unauthorized exploration and salvage that it forced the plaintiff to seek an injunction against the State's bad faith harassment; and it appeared in over thirteen days of hearings and a trial on the merits in which it litigated over thirty issues of fact and law going to the merits of its claim relative to the plaintiff's. Of course, the State has continued (since August, 1980) to assert that it was pursuing the litigation without waiving its rights under the Eleventh Amendment. But this Court holds that if this action is deemed to be against the State for any reason, the State has waived its Eleventh Amendment immunity by its appearance in this lawsuit, its assertion of its claims of ownership, and its extensive litigation of numerous issues on the merits.[16]

**14.** The State's "restricted appearance . . . as authorized under Supplemental Rule E(8)," does not shield its interests in the defendant *res* from being adjudicated. Rule E(8) protects claimants in a *res* from subjecting themselves to general *in personam* liability beyond the value of the *res.*

**15.** On January 5, 1982, this Court granted the State's Motion to Withdraw its Counterclaim as it was unopposed by the plaintiff. That dismissal does not alter the effect of the State's claims made therein. The State's Motion to Dismiss its Counterclaim stated, "The Counterclaim raises no new or different issues from the issues raised in the Complaint and therefore is considered unnecessary to the resolution of the merits." If indeed the Counterclaim raises "no new or different issues from the issues raised by the Complaint," the Complaint is hereby deemed to incorporate the State's affirmative

claim to relief. The State is estopped to claim, both on the basis of its motion and its subsequent conduct, that it has not presented the question of its ownership for the Court's determination.

**16.** This Court is aware that a State's Eleventh Amendment immunity is sufficiently jurisdictional to be asserted after a State makes a general appearance and interposes several affirmative defenses, *Aerojet-General Corp. v. Askew,* 453 F.2d 819, 828 (5th Cir.1974); or after a State takes a jury verdict and asserts the Eleventh Amendment for the first time on appeal, *Dagnall v. Gegenheimer,* 645 F.2d 2, 3 (5th Cir.1981). *See also Treasure Salvors,* —— U.S. at —— n. 18, 102 S.Ct. at 3314 n. 18, and *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). *But see Petty v. Tennessee-Missouri Bridge Comm.,*

556

## III. ANALYSIS OF THE PLAINTIFF'S RIGHTS

The plaintiff, Cobb Coin Company, Inc., seeks to be declared owner in possession of the defendant wrecksite, presumably under the general law of "finds" or, alternatively, seeks a salvage award for salvage services performed on the wrecked vessel under the maritime law of salvage. This Court holds it is unnecessary to apply the law of "finds" in the instant action because the law of salvage provides a complete and adequate basis for resolving the instant case.

█ Under the maritime law of salvage, a salvor has the right to search and explore navigable waters for salvageable sites. Upon "finding" a site which is not being actively and successfully worked by another salvor, he may undertake to rescue the imperiled cargo and bring it before the Admiralty Court for a determination of a salvage award. Further, the "finder" or salvor is entitled to protection of the Court to continue working a wreck as long as he exercises such complete and continuous possession as the circumstances dictate and demonstrates reasonable success in saving the valuables from their peril.

█ This Court holds that, under the maritime law of salvage, the unnamed, wrecked and "abandoned" sailing vessel, believed to be the Almiranta of the New Spain group in the 1715 Spanish Plate Fleet and now known to be scattered on the Corrigan's wrecksite, was indeed "abandoned" when the plaintiff filed this suit on August 17, 1979. The plaintiff's presence on the Corrigan site prior to 1979 and its participation in State leases on that site during that time period are irrelevant to a determination of its rights herein. All previous "finders" or "salvors" of the wreck abandoned it for purposes of the instant action.

█ Cobb Coin Company, Inc. did not exist as an entity until August 17, 1979, the day it filed this suit. Other companies of which Mr. Melvin Fisher is, or was, the chief executive officer, including Universal Salvage Co., Cobb Coin Co. (not registered or qualified to do business in Florida), and Treasure Salvors, Inc., which worked the 1715 sites under contract with State lessees between 1963 and 1972, abandoned their efforts in or before October 1972. Real Eight Company, Inc., and any other entity which has attempted to assign the plaintiff its rights to this wreck, abandoned salvage in or before 1977. That abandonment consisted not of the relinquishment of the State lease but of the cessation of active searching and salvaging efforts on the defendant wrecksite.

The Court further holds that the intervening claimant, Quest Corporation, has fully abandoned the site. It has thus failed to satisfy its burden of establishing its right, asserted in its intervening complaint, to be declared a finder or salvor in possession or for a salvage award. Quest was an intermittent salvor on the Corrigan site between July, 1977, and August, 1979. But it did not exercise the requisite diligence or success necessary to obtain the right to continue salvaging under the protection of the Admiralty Court.

359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959); *Gunter v. Atlantic Coast Line R. Co.,* 200 U.S. 273, 284, 26 S.Ct. 252, 256, 50 L.Ed. 477 (1905), *Clark v. Barnard,* 108 U.S. 436, 447–48, 2 S.Ct. 878, 882, 27 L.Ed. 780 (1883); *Gallagher v. Continental Ins. Co.,* 502 F.2d 827 (10th Cir.1974); *MacDonald v. Board of Regents,* 371 F.2d 818 (6th Cir.1967). The prevailing rule is that a waiver of sovereign immunity is not lightly to be inferred, so Florida can only be held to have waived its Eleventh Amendment immunity by clear and unequivocal consent. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1978). Generally, consent occurs by means authorized under state law, such as a statute of general application, or conduct of the State's attorneys, whose authority is not questioned, clearly evincing an intent to subject the State's rights to the Court's adjudication. For the eleven months following the filing of this suit, Florida's attorneys clearly evinced such intent. The State more than appeared and defended; it sought several forms of affirmative relief and caused the plaintiff to undertake much more serious litigation than is consistent with its hypothetical "restricted claim." Further, the attorneys' authority to act on behalf of the State has not been questioned by any party.

Since the claimant Quest Corporation did not obtain the rights of a first finder or salvor in possession, the plaintiff, Cobb Coin Company, was free under the general federal maritime law to search and explore the area and to seek the protection of the federal court to undertake and continue satisfactory salvage activities. The plaintiff thus appropriately filed its complaint in this Court in August 1979, asking the Court to notify all competing claimants and adjudicate the respective rights of those who claimed an interest in the property which the plaintiff asserts it owns or has a right to continue salving.

### A. Salvage Claim.

▮▮ The Court holds, first, that Cobb Coin Company is entitled to a salvage award for the articles it has retrieved from the Corrigan wrecksite. The three elements of a salvage claim are:

(1) that marine peril exists;

(2) that the service was voluntarily rendered; and

(3) that the effort was successful in whole or in part.

*Platoro Ltd. v. Unidentified Remains of a Vessel,* 518 F.Supp. 816, 820 (W.D.Tex. 1980), citing *Legnos v. M/V Olga Jacob,* 498 F.2d 666, 669 (5th Cir.1974).

▮▮ It is established in this Circuit that a marine peril exists in an ancient, abandoned shipwreck for purposes of meeting the requirements of a valid salvage action. *Platoro Ltd. v. Unidentified Remains of a Vessel,* 614 F.2d 1051, 1055 (5th Cir.1980); *Treasure Salvors I,* 569 F.2d 330, 337 and n. 13 (5th Cir.1978), quoting Norris, The Law of Salvage § 185 (1958). Such peril exists even where the general location of a wreck is known, as it is here. *Platoro,* 614 F.2d 1055, and *Treasure Salvors I,* 569 F.2d at 337. Because the defendant vessel was still in the peril of being lost through the action of the elements or of pirates and was not being successfully salved when the plaintiff undertook its salvage operation, it was subject to a "marine peril" for purposes of the plaintiff's salvage claim.

The plaintiff has satisfied the second and third elements of a salvage claim as well. There is no dispute that Cobb Coin voluntarily rendered the salvage service. It was under no pre-existing duty to save the vessel and its cargo and apparel pursuant to, e.g., a contract or provision of law. Further, the Findings of Fact entered above by this Court amply demonstrate that Cobb Coin successfully saved property of considerable historic, archeological, and monetary value.

### B. Salvage Award.

▮▮ As this Court held in its October 2, 1981, injunctive order, the public policy underlying salvage awards in the Admiralty Court is to hold out a "continuing incentive to undertake the physical and financial risks entailed in salvage operations and to bring the property thus recovered into court for a salvage determination." *Cobb Coin,* 525 F.Supp. at 207. The elements considered by the Admiralty Court in determining a salvage award are:

(1) the labor expended by the salvors in rendering the salvage service;

(2) the promptitude, skill and energy displayed in rendering the service and saving the property;

(3) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed;

(4) the risk incurred by the salvors in securing the property from the impending peril;

(5) the value of the property saved; and

(6) the degree of danger from which the property was rescued.

*Cobb Coin,* 525 F.Supp. at 207, n. 15. *See Also* Norris, 3A Benedict on Admiralty, The Law of Salvage, 7th ed § 244.

(1) The labor expended by the salvors in rendering the salvage service.

Cobb Coin submitted a statement of its expenses incurred in its salvaging activities, which the State did not attempt to contro-

vert.[17] The "deferred salvage expenses" stated on Cobb Coin's balance sheet "for the period ended December 13, 1981," amounted to $284,142.88. These expenses were, primarily, to pay for the labor of captains and crew, subcontracts and charters, professional fees and costs, and fuel.

It appears that through June 22, 1982, the plaintiff has incurred an additional $3,869.72 in salvage-related expenses. Therefore, the total "labor" or monetary expenses incurred by the plaintiff in rendering salvage services to the defendant vessel is approximately $288,012.60.

An important fact developed in this case was the incredibly speculative nature of investment in salvage on sunken treasure ships. Mere searching and charting a site costs hundreds of dollars per day. It costs $3,000 to $5,000 per day to operate the M/V "Dare," the plaintiff's principal salvage vessel. Tr. at 811. It costs $2,000 per day for the same vessel just to let it sit at the dock, e.g., when natural conditions or threatening State law enforcers do not permit salvage. *Id.* The plaintiff employed two salvage vessels at one time on the site in the 1981 season. These operating costs require a vast commitment of capital before exploration, much less salvage, can even begin.

While the costs of salvage are high and constant, the return, in the form of recoveries, is very uncertain and generally uneven. In this case, for example, during the 1980 salvage season, the plaintiff's vessel "Endeavor" went to the Corrigan site on sixty five days, thirty-five of which presented conditions unsuitable for diving. Of the thirty days on which they dove the site, they discovered "high value items" on only nine occasions.

Further, there is no guarantee that the value of the salvaged goods will ultimately exceed the costs of salvage. In this case, as the conclusion of this section describes more fully, the value of the plaintiff's recovery exceeds the out-of-pocket costs to the plaintiff as of the date of the trial. That outcome however, is never certain until the work has been performed and the money has been expended.

(2) The promptitude, skill and energy displayed in rendering the salvage service.

In the salvage of an ancient abandoned shipwreck, skill and energy displayed generally are more critical to the success of the salvage, and thus the determination of an award, than is promptitude. In this case, the plaintiff's skill and energy have been considerable. Cobb Coin's president, Mr. Mel Fisher, and the captains and divers he employs testified to the painstaking methods they use in locating artifacts and raising them from the water. Cobb Coin employs the most modern and sophisticated methods of underwater exploration and shallow water excavation of ancient shipwrecks available. In fact, Mr. Fisher and one of his employees, Mr. Fay Feild, are pioneers in applying magnetometry technology to underwater treasure salvage. Most modern treasure salvors on ancient shipwrecks employ methods developed or adapted by Mr. Fisher and Mr. Feild.

Equally impressive are the efforts Cobb Coin employs to record the valuable historical and archeological information concerning the exact location, depth and proximity of each item found with respect to other items. This information is known in the underwater archeology field as "provenance data." As the Court noted in its October

---

**17.** The State of Florida claims it did not receive the documents describing Cobb Coin's expenses in the normal discovery process, even though they had been among documents ordered produced by the Court. The plaintiff claims, with equal good faith, that it produced these items as part of the discovery previously given. After the trial, counsel for the State renewed their complaint that the information had not been produced, and the plaintiff agreed to file and serve the items upon the Court and

opposing counsel by June 25 at 5:00 p.m. The plaintiff timely filed the requested information in the Court, but, apparently inadvertently, failed to serve them on opposing counsel. The State's lawyer obtained copies from the Court's file within the week. In its post-trial reply memorandum, the State's counsel opposed the plaintiff's attempt to offer the exhibits in evidence, stating they "[o]bviously ... [could] do little to verify the contents of these documents at th[at] time."

1981 injunction order, the provenance data is important not only to historians, archeologists and anthropologists, but it documents the authenticity and thus enhances the resale value of otherwise precious artifacts.

In one of the few cases to apply traditional salvage criteria to salvage on an ancient shipwreck, *Platoro Ltd. v. Unidentified Remains of a Vessel,* 518 F.Supp. 816, 822 (W.D.Tex.1981), the Court declined to hold salvors to the standard of expertise required of marine archeologists in evaluating the skill, promptitude and energy component of the salvage award. This Court takes a slightly different view. Although it is obviously in the salvor's better interest to document provenance on ancient shipwrecks, it is not clear whether the value to the salvor of provenance data will, with certainty, justify the cost of maintaining qualified marine archeologists on the site.

█ This Court now holds that in order to *state a claim* for salvage award on an ancient vessel of historical and archeological significance, it is an essential element that the salvors document to the Admiralty Court's satisfaction that it has preserved the archeological provenance of a shipwreck. To leave this element merely for consideration of a salvage award would not provide, perforce, sufficient incentive to salvors to ensure that the information is obtained. Accordingly, however, this Court holds that by meeting the threshold requirement, a salvor simultaneously "enhances" the value of his recovery in such a way as will be explicitly recognized by the Court in the determination of the salvage award.

(3) The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed.

The conditions under which Cobb Coin has salved this wreck posed no extraordinary dangers. The plaintiff employed two salvage vessels on this site during the 1981 season and one vessel during the 1979 and 1980 seasons, and used sophisticated magnetometer, remote sensing, and scan sonar equipment to locate scattered objects. Cobb Coin employs the "state of the art" in its salvaging efforts; the value of such equipment is considerable. It is subject to normal depreciation and risk associated with its use.

This wreck is located in shallow Atlantic waters. Shallow water shipwreck excavation and salvage does not present the types of dangers associated with deep water salvage.[18] Mr. Fisher did testify that his divers dug up hundreds of explosive mines and thousands of bombs which had been abandoned in the area of the wreck. Tr. at 477. The plaintiff's equipment was not subject to unusually dangerous physical risk, however.

(4) The risk incurred by the salvors in securing the property from the impending peril.

The risk of physical danger which the plaintiff's employees have faced is not greater than the risk to which its equipment is subject. It should be noted, however, that three of Cobb Coin's divers on this site were subject to continuous threats and harassment by State law enforcement officials during the time Cobb Coin worked the wreck under the protection of this Court. They were arrested at one point during these proceedings. While the "risk" of arrest is not one the Court expects to find in typical salvage cases, it constituted a very real and serious matter throughout this case.

Finally, as for financial risk, the discussion of the first factor in this section describes how very risky financially salvage on abandoned treasure wrecks is.

(5) The value of the property salved.

---

18. Mr. Fisher testified that when his group was working the East Coast sites with Real Eight in 1972, a salvage barge, Gold Digger, mysteriously was wrecked at the Colored Beach site. "[A] couple of hundred grand went down the drain, or in the ocean," according to Fisher. Tr. at 238. That event, however, does not appear to have been related to typical salving conditions. Further, the Gold Digger sank on a different wreck and during a different time period than are relevant to this suit.

According to the logs submitted in evidence and the testimony of the plaintiff's chief artifact custodian, Arthur Hartman, Cobb Coin recovered 1034 silver coins, twelve Royal Eight escudos, ten to twelve clumps of silver coins, two gold discs, and hundreds of miscellaneous "encrusted objects" through the 1981 salvage season. The silver coins consist of 449 Eight Reales, 171 Four Reales, and 584 Two, One and One-half Reales. See State's Exhibits No. 26 and 67, and Plaintiff's Exhibit No. 31. Mr. Hartman estimated the value of a "nice" "silver, dated 1714 Cob Eight" Reale to be "somewhere between five to six hundred dollars, maybe more." Tr. at 805–06. He estimated that dated Eight escudos ranged between $5–7,000 for "poor" ones, and between $12,000 to $15,000 for "the best one out of the group." Tr. at 806. There was no direct testimony as to the value of the individual coins recovered, however. Approximating on the basis of Mr. Hartman's estimates, assuming the value of the "average" silver Eight Reale is $500, Four Reale is $250, and of the group of Two, One, and One-half Reales is $75, the total value of the silver coins recovered is approximately $311,050. Assuming the average Royal Eight escudo is worth $10,000, the total value of the gold escudos is approximately $120,000.

No market value was proffered for the clumps of silver coins or the two gold discs. The Court finds that each gold disc is worth as much as an average Eight escudo, $10,000. The Court simply cannot assess the value of the silver clumps.[19]

Based on the foregoing the identifiable gold and silver artifacts recovered by the plaintiff through the 1981 salvage season are worth approximately $451,050.00. The plaintiff also recovered several "encrusted objects" and other interesting artifacts which have historic and perhaps some pecuniary value to interested collectors. The plaintiff did not attempt to introduce criteria by which the Court could quantify the value of these artifacts.

(6) The degree of danger from which the property was rescued.

The remains of the wrecked vessel are located about 100 feet from the beach under fairly shallow water. The artifacts recovered by the plaintiff are located underneath between six to twenty-two feet of sand. Archeologists for the State testified that in their opinion ancient shipwrecks buried under the sand are in no "peril" at all; they are undisturbed "time capsules" rich with archeological, anthropological and historical data.[20] They felt that salvage on old wrecks actually created a "peril" for these artifacts by disturbing their tranquil existence. See testimony of Larry Murphy and Wilburn Cockrell on June 17, 1982. They also conceded, however, that items buried under the sand in shallow water, or "high energy zones" could be moved by weather and wave action, although items in "deep pockets" are less likely to be moved around. The parties did not debate whether the items saved were recovered from "deep pockets" or from "high energy zones." This Court holds that the distinction is irrelevant for purposes of the salvage award. These artifacts were recovered from under many

**19.** According to the point system under which the State divided artifacts with Real Eight for the 1971 season, both a 1715 eight escudo and a "gold disc" weighing 595.4 g received grades of 350 points. See State's Exhibit No. 68, Index No. 10; Report of Division of Artifacts and Coins Recovered Under Salvage Lease # 1329 (As Modified) During the 1971 Salvage Season. There is no basis in the record to assess more accurately the value of the clumps of silver coins recovered by the plaintiff.

**20.** Dr. Wilburn Cockrell, the administrator of the Florida Division of Archives and Records Management, explained that ancient shipwrecks are valuable for three separate, often conflicting, purposes: structure, artifacts, and data. As a manager, he often has to decide which goal to serve, to the exclusion of others. He personally believes that an ancient shipwreck is a time capsule, which is destroyed when it is "opened up" for artifact or data extraction. But in modern times, the Corrigan site, as well as many other ancient "time capsules" under his agency's jurisdiction, were "opened up" and "destroyed" under the express permission and encouragement of the State of Florida. Dr. Cockrell conceded that he personally disagrees with the State's entire program for dealing with ancient shipwrecks.

feet of ocean sand through the plaintiff's skilled and laborious efforts. Had they not been saved, they likely would still be lying on the ocean bottom subject to further rearrangement and, perhaps, loss from weather conditions. Further, if not recovered, they would be threatened by pirates who might have disturbed the site and removed the articles without the supervision of the Admiralty Court.

## C. Conclusion—Award.

■■■ As this Court indicated in its October 2, 1981, order, the traditional recovery for a salvor is the amount of his expenses plus a salvage award based on the merit of his services. See *Cobb Coin,* 525 F.Supp. at 207. In this case, the plaintiff's expenses were $288,012.60 and the value of the property saved is approximately $451,050. As this Court also indicated, the appropriate form of award in a case like this should differ from traditional awards. It should be given *in specie* because the property saved is uniquely and intrinsically valuable beyond its monetary value. See *Cobb Coin,* 525 F.Supp. at 198. The Court therefore holds that the plaintiff, Cobb Coin Company, Inc., shall be awarded all the artifacts it has recovered since the inception of this lawsuit, as compensation for its expenses and an award for superlative salvage services.

The Court further holds that Cobb Coin has established a right to the protection of this Court to conduct further salvage activities, for as long as it demonstrates the requisite diligence and success in its efforts.

The Court therefore retains jurisdiction:

1. To protect the Plaintiff's valid salvage operations on the defendant wreck, and to adjudicate its rights vis-a-vis competing salvors who may assert a superior right to salve the defendant wreck and

2. To adjudicate the plaintiff's claim to a salvage award on a periodic basis. The plaintiff shall file in this Court, beginning on February 1st, 1983, and on February 1st of each subsequent year, its claim stating with specificity the value of the salvage services performed and cataloguing the ar-

tifacts saved in the previous calendar year. Any failure to file by that date will constitute *prima facie* evidence that it has abandoned the defendant wreck site, and the plaintiff will have thirty days to attempt to rebut that presumption, through appropriate pleadings, after which this case will be closed. The State of Florida is invited to intervene and seek certain artifacts to be exhibited throughout the State for the benefit of the People of Florida.

## D. Right to Artifacts Recovered Prior to this Suit.

The Plaintiff also asserts that it is entitled to be declared owner of or to a salvage award for the artifacts retrieved from the Corrigan wreck site prior to the institution of this suit. The Honorable Sidney M. Aronovitz, United States District Judge, ordered the U.S. Marshal to "Take into his possession and control any and all items that have or will come up from the wreck in question, no matter who has brought up or will bring up such items until a determination of ownership is made or further order of this Court is issued." Order dated August 24, 1979, Docket No. 5. Judge Aronovitz, obviously and correctly, asserted jurisdiction over the entire wreck, including artifacts previously salved, in order to preserve this Court's ability to make a meaningful determination of the unsettled issues presented by this case.

■■■ This Court now holds that its jurisdiction does not extend to artifacts salved prior to the institution of this lawsuit. The Court need not, indeed it cannot, decide what rights accrued to the plaintiff for its work or its assignors' work on the site prior to 1977. Whether it was working under a "contract for salvage," or even "voluntarily," Cobb Coin Co., Inc., and companies it purports to represent are hereby held to have waived their federal rights to a salvage award by operating expressly under contract with the State. Nothing in this record demonstrates or even suggests the invalidity *vel non* of those State leases, nor any reason the parties should not be bound

thereby. Prior to the plaintiff's invocation of the Federal Admiralty Court for a determination of its rights, there was no reason to preempt an otherwise valid State statute. No conflict existed until this Court acquired jurisdiction over a cause of action arising under federal law, where that cause of action required for its enforcement a determination that federal law was paramount to a particular state law attempting to govern the same subject matter.

This Court thus holds that, as far as the plaintiff is concerned, the federal jurisdiction extends only to the operations begun since the inception of this lawsuit. The complaint fails to state a claim for which relief can be granted as to items of salvage recovered prior to August 17, 1979.

## IV. CLAIMANT STATE OF FLORIDA'S FUTURE ROLE IN THIS LITIGATION

■ In the October 2, 1981 Order Granting the Preliminary Injunction, this Court stated that it intended to award a portion of the artifacts recovered from the defendant wreck site to the State, as Trustee for the people, for the purpose of exhibiting the property for the people's benefit. The evidence at the trial showed that the Division of Archives, History and Records Management possesses numerous artifacts obtained from lessees who salved the 1715 wrecks in the past two decades, and that a significant portion are displayed in museum exhibits around the state. *See* State's Exhibit No. 68 and testimony of Wilburn Cockrell on June 17, 1982. This Court hereby finds that the State's possession of a representative cross-section of recovered 1715 artifacts makes it inappropriate to award further artifacts to the State at this time. This finding is without prejudice, however, to the right of Division of Archives, History and Records Management to intervene in future salvage award determinations before this court, *see* section IV.C., *supra,* to assert an interest on behalf of its citizenry to particular artifacts recovered which are not represented in its present inventory and which it feels are essential to the preservation of the people's heritage.

This Court has previously ordered, pending a final determination on the merits of the suit, that the State be permitted to place an agent on board the plaintiff's salvage vessels to catalogue and authenticate items salved. Now, having decided that the plaintiff is entitled under federal law to possession of the wreck site for the purpose of conducting salvage, the Court hereby dissolves its order permitting the State's agents to board the plaintiff's salvage vessels on the Corrigan wreck site. The State's interest can adequately be protected by the continued documentation and preservation of artifacts, pending distribution by the United States Marshal, or his designee, and by the State's right to intervene in the annual salvage determination as outlined in the preceding paragraph.

Finally, the October 2, 1981 order temporarily enjoined the agents, employees, and attorneys of the State of Florida from interfering with the plaintiff's ongoing salvage operations or arresting the plaintiff's officers, agents, and employees. That injunction is hereby made permanent now that the plaintiff has succeeded on the merits of its salvage claim under federal law.

## V. PLAINTIFF'S REQUEST FOR ATTORNEY'S FEES

■ The plaintiff, successful on the merits herein, seeks an award of attorney's fees and costs from the State for the enormous expense to which the State has put the plaintiff in attempting to enforce its Federal rights. "The award of attorney's fees in admiralty actions is discretionary and is specifically permitted in salvage cases." *Platoro Ltd. v. Unidentified Remains of a Vessel,* 518 F.Supp. 816, 823 (W.D.Tex.1981), citing *Compania Galeana, S.A. v. Motor Vessel Caribbean,* 565 F.2d 358 (5th Cir.1978). In this case, the State has forced the plaintiff to undertake massive litigation to receive a determination of its Federal rights in this forum. This case has nearly 350 pleadings filling seven volumes and has required thirteen days of hearings, eleven on an emergency basis,

which generated to this point fifteen volumes of transcripts. Most of the litigation, would have been unnecessary if the State had not intervened and filed its claims and defenses. Most notably, the eleven-day injunction hearing was necessitated by the bad-faith harassment conducted by State officers and attorneys attempting to enforce Florida laws in derogation of this Court's jurisdiction. Under admiralty salvage law, there is a sufficient legal basis to award the plaintiff its attorney's fees and costs.

■ Attorney's fees and costs for the plaintiff in this case are not precluded by the Eleventh Amendment. An award of attorney's fees is not an imposition of retroactive liability on the State for pre-litigation activity; it compensates the plaintiff for expenses incurred in litigation seeking prospective relief. *See Hutto v. Finney,* 437 U.S. 678, 695, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522 (1978).

Having found the plaintiff is entitled to recover its attorney's fees, however, the Court finds that the documents submitted by the plaintiff are inadequate to permit an accurate formulation of a proper award. The plaintiff's counsel is thus required to file with the Court and serve upon counsel for the State, within twenty (20) days of the date of this order, an affidavit setting forth precisely the number of hours worked, the billing rate applicable to each chargeable hour, and the amount actually paid by the client. The claimant State of Florida shall respond within ten (10) days from the date it is served, computed according to the Federal Rules of Civil Procedure.

## V. RELIEF

In light of the foregoing, it is hereupon ORDERED and ADJUDGED as follows:

1. The plaintiff shall be awarded the artifacts now held by the United States Marshal which were recovered between August 20, 1979 and the date covered by the Marshal's Inventory of Artifacts, July 23, 1981.[21] Artifacts recovered between July 23, 1981 and December 31, 1983 shall be divided in the Court's February, 1983 salvage determination.

2. This Court retains jurisdiction to protect the plaintiff's valid salvage operations and to adjudicate its claim to a salvage award on a periodic basis (each February hereafter) in the manner detailed in Section IV.C. of this Order.

3. The portion of the plaintiff's complaint which asserts a right to artifacts recovered prior to the institution of this suit fails to state a claim upon which relief can be granted, and is hereby dismissed.

4. The officers, agents, and employees of the State of Florida are permanently enjoined from interfering with the plaintiff's ongoing salvage operations and from arresting or prosecuting the plaintiff's officers, agents, and employees. All such state officers, agents, and employees are enjoined from docketing a "pending" indictment for trial, and from estreating any bond previously set and posted for persons arrested in connection with diving on the defendant wrecksite. This injunction shall be in full force and effect as long as this Court retains jurisdiction over this matter.

Further, this Court's earlier order permitting an agent of the Claimant State of Florida on board the plaintiff's salvage vessels is hereby dissolved.

5. The plaintiff is entitled to recover reasonable attorney's fees. The attorney for the plaintiff shall file his affidavit setting forth the plaintiff's requested attorney's fees within twenty (20) days of the date of this Order, and the Claimant shall

---

**21.** Mr. Arthur Hartman, captain of the salvage vessel "Dare" and chief artifact custodian for the plaintiff, was appointed Substitute Custodian by the United States Marshal for the artifacts recovered by the plaintiff. He testified on July 29, 1981, that the plaintiff had recovered 734 silver coins in 1980 and 300 in 1981. Tr. at 803–05. The Inventory of Artifacts filed by Mr. Hartman and the U.S. Marshal with the Court on July 23, 1981, stated that he had custody of 739 silver coins. Inventory File Docket No. 211. The relative value of the plaintiff's costs to its recovery, *supra,* was computed on the basis of 1034 coins. The award herein is based upon the official artifact inventory filed by the U.S. Marshal.

respond, in the manner detailed in Section V of this Order.

The foregoing was DONE and OR-DERED in chambers at the United States Courthouse, Miami, Dade County, Florida this 31st day of August 1982.