[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11246
_____

D.C. Docket No. 9:79-cv-08266-JLK

SALVORS, INC.,
a Florida corporation,
f.k.a. Cobb Coin Company, Inc.,

                                         Plaintiff,

1715 FLEET-QUEENS JEWELS, LLC,
c/o 608 Whitehead Street,
Key West, FL 33040,

                                         Plaintiff - Appellee,

GOLD HOUND LLC,

                                         Intervenor Plaintiff - Appellant,

versus

UNIDENTIFIED WRECKED & ABANDONED VESSEL,

                                         Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 5, 2017)

Before MARCUS, JILL PRYOR, and SILER,[*] Circuit Judges.

MARCUS, Circuit Judge:

This in rem admiralty proceeding began in 1979, when Cobb Coin Company retrieved a cannon from wreckage discovered off the coast of Florida. That cannon was part of a shipwreck dating back to 1715, when eleven Spanish galleons carrying gold, silver, and precious jewels perished off the Florida coast in a hurricane. Over the next 264 years, the shifting tides spread and then buried the remains of these ships and their cargo along the coastline. In 1982, Cobb Coin was awarded exclusive salvaging rights to the shipwreck of one of those galleons, and the district court held (and continues to hold) a yearly distribution hearing to adjudicate title to the recovered artifacts and allow competing claimants to be heard. This process has been carried out faithfully since 1982.

Sometime in 2010, Cobb Coin's successor-in-interest assigned its exclusive salvaging rights to plaintiff-appellee 1715 Fleet-Queens Jewels, LLC ("Fleet-Queens"). By this time, the wreckage had spread out along forty-one miles of the

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

South Florida coastline.  Fleet-Queens worked with subcontractors, including intervenor-appellant Gold Hound, LLC, to assist it in its salvaging operations. Gold Hound utilized allegedly proprietary maps, data, and software to salvage a specific area on behalf of Fleet-Queens.  In 2013, Fleet-Queens sought to renegotiate its contract with Gold Hound and asked Gold Hound to relinquish ownership of this proprietary information; Gold Hound refused and the parties did not renew the contract.

During the 2015 salvage season, Fleet-Queens recovered approximately four hundred gold coins, among other treasures, from an area that Gold Hound had allegedly been salvaging while acting as a subcontractor for Fleet-Queens.  Gold Hound claimed that this discovery was made using its proprietary maps and software, and accordingly it sought to intervene in the in rem action to assert a maritime lien over some of these artifacts and to assert several state-law claims.  It also sought to contest Fleet-Queens's exclusive salvage rights because Fleet-Queens allegedly mishandled the artifacts in violation of the district court's 1982 order.  The district court denied the motion to intervene.  Gold Hound then filed a claim asserting a maritime lien and participated in the 2015 distribution hearing, but the district court concluded that it was not entitled to a maritime lien.  Gold Hound now appeals these rulings and also challenges the district court's continued exercise of subject-matter jurisdiction over the entire dispute.

3

After review, we conclude that the district court properly determined that it had and continues to have subject-matter jurisdiction over the res.  However, Gold Hound should be granted leave to intervene in this proceeding to assert its in rem claims.  On remand, we leave it to the district court's sound discretion to determine whether to exercise supplemental jurisdiction over Gold Hound's related state-law claims, including, inter alia, its claims for breach of contract, misappropriation of trade secrets, breach of fiduciary duty and constructive trust, and tortious interference.  As for Gold Hound's claimed maritime lien, we cannot decide on this record whether Gold Hound may succeed because basic facts remain in dispute. We, therefore, vacate the district court's denial of Gold Hound's motion to intervene and its denial of Gold Hound's claim to a maritime lien and remand the case to the district court for further proceedings consistent with this opinion.

I.

This case began long ago as an in rem action brought by Cobb Coin Company against the "remains of what is believed to be the Almiranta of the New Spain Group of the 1715 Plate Fleet, known to the Spanish by two names: San Christo del Valle and Nuestra Senora de la Concepcion," which rests somewhere off the coast of Florida near Vero Beach ("the 1715 wreck").  Cobb Coin Co. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 549 F. Supp. 540, 545 (S.D. Fla. 1982).  The complex procedural history of this lawsuit began on August 17,

4

1979, when Cobb Coin filed an in rem admiralty complaint against the vessel in the United States District Court for the Southern District of Florida to notify the district court and the U.S. Marshal that it intended to retrieve a cannon from the 1715 wreck; the cannon served as the basis for in rem jurisdiction. Id. at 547. Cobb Coin sought a declaration that it was the owner in possession of the wrecked vessel and sought exclusive salvage rights over the wreck. Cobb Coin Co. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 525 F. Supp. 186, 190 (S.D. Fla. 1981). Because the area and cargo at issue lay within the territorial limits of the state of Florida, the State intervened, claiming ownership of the vessel and its cargo under the Florida Archives and History Act, Fla. Stat. ch. 267. See Cobb Coin, 525 F. Supp. at 197, 200.

Three days later, on August 20, 1979, Cobb Coin retrieved the cannon from the wreck site. Id. at 191. The district court concluded that it had subject-matter jurisdiction under 28 U.S.C. § 1333 and that Cobb Coin's possession of the cannon "constituted constructive possession of the wreck itself and everything that is a part thereof, wherever located, and whenever removed therefore, past, present or future." Id. (quotations omitted). Florida then sought injunctive relief designed to prevent Cobb Coin from continuing to salvage the site; the district court denied that request and Cobb Coin continued to salvage the 1715 wreck. Id. at 191–92.

On July 7, 1981, the district court entered a temporary restraining order for Cobb Coin and enjoined the State from interfering with Cobb Coin's ongoing salvage operations. Id. at 192–93. The district court subsequently converted this order into a preliminary injunction. Id. at 220. And on August 31, 1982, after a two-day bench trial, the district court made the preliminary injunction permanent, concluding that "Cobb Coin ha[d] established a right to the protection of this Court to conduct further salvage activities, for as long as it demonstrates the requisite diligence and success in its efforts." Cobb Coin, 549 F. Supp. at 561.

The district court retained jurisdiction "[t]o protect the Plaintiff's valid salvage operations on the defendant wreck," "to adjudicate its rights vis-a-vis competing salvors who may assert a superior right to salve the defendant wreck," and "[t]o adjudicate the plaintiff's claim to a salvage award on a periodic basis." Id. The district court set a schedule accordingly: on February 1 of each year, Cobb Coin would be required to file a claim stating the value of the salvage services performed and cataloguing the artifacts salvaged in the previous calendar year. Id. Failure to file by that date would constitute prima facie evidence that Cobb Coin had abandoned the wreck, and it would have thirty days to rebut that presumption through appropriate pleadings. Id. The state of Florida, in turn, was "invited to intervene and seek certain artifacts to be exhibited throughout the State for the benefit of the People of Florida." Id.

6

This injunction was never appealed or reversed and remains in effect today. In accordance with the district court's 1982 order, Cobb Coin and the state of Florida entered into a settlement agreement on June 3, 1983, adopting the order. On August 29, 1983, the district court issued a binding consent judgment approving the settlement. Salvage proceeded as dictated by the terms of the district court's 1982 order for the next twenty-seven years. Other parties would occasionally appear at the distribution hearings to assert claims over some of the recovered artifacts, and often the State would appear to reserve a portion of the recovered artifacts for display in museums.

Over the centuries, the wreckage had spread out along forty-one miles of the Florida coastline. Cobb Coin's successor-in-interest thus began working with various subcontractors to assist in salvaging the wreck; Gold Hound, LLC, was one of them. In the spring of 2010, Gold Hound entered into an agreement with Cobb Coin's successor-in-interest under which it would perform salvage services as a subcontractor and would be entitled to 50 percent of the value of the treasure it recovered. A few months later, Cobb Coin's successor-in-interest assigned its exclusive salvaging rights to the plaintiff-appellee 1715 Fleet-Queens Jewels, LLC. That assignment was approved by the district court and by the state of Florida. Fleet-Queens then became a party to this action and continued the salvage operations in accordance with the district court's 1982 order.

7

In 2011, Gold Hound and Fleet-Queens entered into a contract to engage in joint exploration of the 1715 wreck. Gold Hound acted as a subcontractor for Fleet-Queens and salvaged a specific area of the 1715 wreck on Fleet-Queens's behalf. Gold Hound purportedly used proprietary maps and computer software to conduct its salvaging work. On May 1, 2013, Fleet-Queens attempted to renegotiate its contract with Gold Hound to add new terms requiring that Gold Hound surrender ownership of its intellectual property. When Gold Hound refused, Fleet-Queens allegedly took a computer with the software on it, converted the data and maps to its own use, and barred Gold Hound from working as a subcontractor on the site. Some two years later, on June 30, 2015, gold treasure was discovered, allegedly in the area where Gold Hound had been working. Gold Hound now claims that the discovery was made based on the use of its proprietary software and trade secrets, which it claims were misappropriated by Fleet-Queens.

On September 15, 2015, the district court scheduled a distribution hearing for artifacts recovered during the 2014 salvage season for October 19, 2015. Fifteen days later, on September 30, 2015, Gold Hound moved to intervene in this suit, claiming a portion of the artifacts recovered during the 2014 and 2015 salvage seasons. Gold Hound also filed an intervening complaint in which it alleged breach of contract, various in rem claims, breach of fiduciary duty and constructive trust, tortious interference with a contractual relationship, civil remedies for certain

8

practices, misappropriation of trade secrets, and unfair competition.  Finally, it claimed the district court acted without subject-matter jurisdiction over the res.

Gold Hound did not participate in or file a claim at the 2014 distribution hearing (held on October 19, 2015), but a hearing on its motion to intervene was conducted on November 17, 2015.  The district court ultimately denied the motion on February 19, 2016, ruling that Gold Hound lacked standing, that it had been untimely in seeking intervention, and that it had failed to show either that its interests were properly cognizable in this admiralty action or that its interests weren't otherwise protected by the parties to the action.  Gold Hound timely appealed.

Following the procedures that it had employed for many years, the district court scheduled the 2015 distribution hearing for March 16, 2016.  Fleet-Queens and the district court gave notice that any potential claimants had to file their claims at least ten days before the hearing.  Accordingly, Gold Hound timely filed a claim asserting a maritime lien over the 2015 artifacts on March 4, 2016, and it appeared at the hearing.  On March 16, 2016, the district court issued its yearly order adjudicating title to the articles of salvage from the 2015 season.  The district court concluded that there had been "continuous and on-going salvage activity" performed by Fleet-Queens during the 2015 salvage season and that Fleet-Queens had "continued to exercise such dominion and control over the various Defendant

9

vessels . . . so as to justify [its] exclusive right to continue the salvage activities herein." Gold Hound's claim was denied because "Gold Hound [did] not assert that it discovered or recovered any of the artifacts that [were] the subject of Plaintiff's Motion for Distribution." The district court's order denying Gold Hound's claim briefly mentioned Gold Hound's state-law claims and noted that those allegations "may be sufficient to support a new, separate action for damages, but they [were] insufficient to maintain a claim of a superior salvage right to the Defendant wreck than that which is possessed by [Fleet-Queens]." Gold Hound amended its notice of appeal to include the denial of its claim.

Gold Hound subsequently filed a motion to show cause regarding the alleged mishandling of artifacts, a motion to stay distribution of the res, and, finally, a motion for emergency consideration of the motion to stay distribution. All were denied by the district court. Gold Hound still again amended its notice of appeal, this time to include the denial of the motion to show cause.

Fleet-Queens, in turn, has cross-appealed for sanctions and has asked this Court to take judicial notice of a related, pending state-court action.

II.

We are obliged to review issues pertaining to a court's subject-matter jurisdiction de novo. Peebles v. Merrill Lynch, Pierce, Fenner & Smith Inc., 431 F.3d 1320, 1324 (11th Cir. 2005). "Prior to making an adjudication on the merits,

10

we must assure ourselves that we have jurisdiction to hear the case before us."
Resnick v. AvMed, Inc., 693 F.3d 1317, 1323 (11th Cir. 2012).  Thus, we begin
our analysis by examining whether the district court properly exercised subject-
matter jurisdiction over this admiralty proceeding in 1979 and whether it continues
to have subject-matter jurisdiction over the ongoing proceedings.  We hold that it
had and continues to have jurisdiction over this basic admiralty claim.

A.

It is by now axiomatic that "[f]ederal courts exercise limited subject matter
jurisdiction, empowered to hear only those cases within the judicial power of the
United States as defined by Article III of the Constitution or otherwise authorized
by Congress."  Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994).  Article
III of the United States Constitution extends the judicial power to "all Cases of
admiralty and maritime Jurisdiction."  U.S. Const. art. III, § 2, cl. 1.  And Congress
has specifically conferred on the federal district courts exclusive, original
jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction," as well as
over "[a]ny prize brought into the United States and all proceedings for the
condemnation of property taken as prize."  28 U.S.C. § 1333.

It is also clear that "[a]n in rem suit against a vessel is . . . distinctively an
admiralty proceeding, and is hence within the exclusive province of the federal
courts."  Am. Dredging Co. v. Miller, 510 U.S. 443, 446–47 (1994).  But

11

"[a]lthough federal courts have the exclusive power to adjudicate in rem suits against a vessel, that power is dependent on the court's jurisdiction over the res, the property named as the defendant." Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1171 (11th Cir. 2011). "Only if the court has exclusive custody and control over the property does it have jurisdiction over the property so as to be able to adjudicate rights in it that are binding against the world." Id. (quotations omitted). Thus, "when a party files an in rem complaint, the court issues a warrant for the arrest of the res and the res remains in the court's custody for the remainder of the proceedings." Id.

Admiralty jurisdiction in Cobb Coin's original case was based on a cannon recovered from the wreck site of an abandoned vessel believed to have been part of the Spanish 1715 fleet. See Cobb Coin, 525 F. Supp. at 191. The district court entered an arrest in rem for the cannon and directed the U.S. Marshal to take the cannon into custody. See id. at 190–91. In its 1981 order preliminarily enjoining Florida officials from interfering with Cobb Coin's salvaging activities, the district court concluded that actual possession of the cannon was tantamount to constructive possession of the wreck itself, which was enough to give the district court in rem jurisdiction "to dispose of all articles thereafter brought up" from the wreck site. Id. at 197. This conclusion was reaffirmed in the district court's 1982

12

order granting Cobb Coin a permanent injunction, and that order has never been appealed or modified.  See Cobb Coin, 549 F. Supp. at 561.

Gold Hound now challenges the district court's exercise of subject-matter jurisdiction, arguing that the district court cannot exercise in rem jurisdiction over property that is not in the court's possession but is instead spread out over forty-one miles of the Florida coast.  It also says that the district court erred by using the cannon as the foundation for exercising constructive in rem jurisdiction over the entire shipwreck.  We are unpersuaded.

The theory of constructive in rem jurisdiction is well established in admiralty cases.  The Supreme Court has long recognized that "[i]n order to institute and perfect proceedings in rem, it is necessary that the thing should be actually or constructively within the reach of the Court."  The Brig Ann, 13 U.S. (9 Cranch) 289, 291 (1815) (emphasis added); see also Republic Nat'l Bank of Miami v. United States, 506 U.S. 80, 87 (1992) ("The Brig Ann simply restates the rule that the court must have actual or constructive control of the res when an in rem forfeiture suit is initiated.") (emphasis added).  Federal appellate courts have followed suit.  See, e.g., Dluhos v. Floating & Abandoned Vessel, Known as "New York", 162 F.3d 63, 69 (2d Cir. 1998) ("[I]n order to maintain an in rem action against a res where taking of actual possession is impracticable, a warrant of arrest must still issue from the court, but the possession of the res after the arrest may be

13

constructive as opposed to actual."); R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 964 (4th Cir. 1999) ("While the res must be in custodia legis (in the court's possession), this possession may be actual or constructive."); Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel, 640 F.2d 560, 572 (5th Cir. 1981)[1] ("[A] finder need not always have manual possession of the thing. Rather, a finder may be protected by taking such constructive possession of the property as its nature and situation permit.") (quotations omitted); Great Lakes Expl. Grp., LLC v. Unidentified Wrecked & (for Salvage-Right Purposes), Abandoned Sailing Vessel, 522 F.3d 682, 694 (6th Cir. 2008) (noting that courts may "exercise constructive jurisdiction over [an] entire shipwreck").

The theory of constructive in rem jurisdiction also applies to cases in which a ship and her cargo are spread out on the ocean floor. Thus, for example, we have recognized that "a site where the remains of a vessel are strewn on the ocean floor is still a shipwreck even if an intact vessel no longer remains." Odyssey Marine, 657 F.3d at 1181 n.15; see also id. at 1174 (noting that even if "it is undisputed the shipwreck site does not contain an 'intact' vessel, this fact is not determinative"). So long as the court constructively possesses part of a scattered wreck, it may exercise constructive in rem jurisdiction over the entirety of that wreck just as the

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

14

court would exercise constructive in rem jurisdiction over the entirety of an intact vessel.  See R.M.S. Titanic, 171 F.3d at 964 ("[E]xercising in rem jurisdiction over an entire ship wreck within the court's territorial jurisdiction when only part of that wreck is actually presented to a court rests upon the fiction that the res is not divided and that therefore possession of some of it is constructively possession of all."); Great Lakes, 522 F.3d at 694 ("To obtain possession over the res, district courts sitting in admiralty may issue a warrant of arrest for a physical part of a shipwreck (an 'artifact') and, based on this arrest, exercise constructive jurisdiction over the entire shipwreck."); see also California v. Deep Sea Research, Inc., 523 U.S. 491, 496 (1998) (approving the exercise of in rem jurisdiction over a shipwreck when that jurisdiction was based on artifacts recovered from the wreck, including "china, a full bottle of champagne, and a brass spike from the ship's hull").  The plain meaning of the term "shipwreck" supports this idea: the term "covers not only a sunken intact vessel, but also a vessel that was 'dashed to pieces' or exploded at the surface and then sank to the ocean floor."  Odyssey Marine, 657 F.3d at 1181 n.15; see also id. at 1180–81 (noting that the Abandoned Shipwreck Act "defines 'shipwreck' as 'a vessel or wreck, its cargo and other contents'") (quoting 43 U.S.C. § 2102(d)).

Moreover, contrary to Gold Hound's assertion, this Court has not rejected the application of constructive in rem jurisdiction in cases like this one.  Gold

15

Hound claims that this Court has rejected the theory of constructive in rem jurisdiction for cases in which "the debris field is isolated and not in geographical association with any shipwreck" (quotations omitted). Gold Hound relies on a single unpublished case, Martin v. One Bronze Rod, 581 F. App'x 744 (11th Cir. 2014), but even that case is readily distinguishable. In Martin, the plaintiff found and took possession of one bronze rod and also claimed that he had pinpointed the location of three buried chests that he had yet to retrieve. Id. at 745. The district court issued a warrant of arrest in rem as to the bronze rod but declined to issue a warrant for the three buried chests; a panel of this Court affirmed on appeal. Id. The panel concluded that "Martin ha[d] not sufficiently demonstrated that the rod and the chests [were] part of an undivided res so as to allow the court to exercise constructive in rem jurisdiction over the chests based on his salvage of the rod." Id. at 748–49. Indeed, the claimant himself asserted that "the chests were intentionally buried -- as opposed to being scattered by the sinking of any ship." Id. at 749 n.6.

> The Court went on to observe:

> Martin cites no case indicating that a theory of constructive possession, which courts have used to exercise constructive in rem jurisdiction over an entire shipwreck when only part of the wreck is presented to the court, extends to separate items of cargo that are isolated from one another and do not hail from any shipwreck. And we decline the opportunity to extend the theory in such a way under the circumstances of this case.

16

Id. at 749 (footnote omitted).  In this passage, the panel made it clear that constructive in rem jurisdiction has been exercised "over an entire shipwreck when only part of the wreck is presented to the court" -- which exactly matches the facts of this case.  Id.; accord Treasure Salvors, 640 F.2d at 572 ("[I]n order to acquire a legally cognizable interest in lost or abandoned property, a finder need not always have manual possession of the thing.  Rather, a finder may be protected by taking such constructive possession of the property as its nature and situation permit.") (quotations omitted).

Critically, there was no indication in Martin that the salvaged items originated from the same wreck.  While Martin's treasure chests may have come from an entirely different wreck than his bronze rod or, indeed, from no wreck at all, the 1715 wreck can fairly be seen as one undivided res, even if the res was no longer intact.  The cannon that was recovered at the start of this case came from the 1715 wreck, and the cargo that was found does "hail from a[ ] shipwreck," Martin, 581 F. App'x at 749, even if that vessel is no longer intact.  Indeed, in Martin we even noted that the facts of the case were "distinct from those in which courts have applied a theory of constructive in rem jurisdiction over an entire shipwreck based on actual possession of a part thereof."  Id. at 749 n.6.  Thus, even if it were binding, this Court's unpublished decision does not undermine the district court's

17

assertion of power over the ongoing proceedings in this case.  The district court properly exercised subject-matter jurisdiction in 1979 and properly does so today.

## B.

Gold Hound also argues that even if the district court had jurisdiction at the inception of the case, the Abandoned Shipwreck Act of 1987 (ASA), Pub. L. No. 100-298, 102 Stat. 432 (1988), codified at 43 U.S.C. § 2101–06, has denuded the court of jurisdiction and returned both title to the res and jurisdiction over the dispute to the state of Florida.  Again, we disagree.

When this case was first filed, Florida intervened in the action and claimed ownership of the cannon under the Florida Archives and History Act, Fla. Stat. ch. 267.  See Cobb Coin, 549 F. Supp. at 544.  Section 267.061(1)(b) says that "all treasure trove, artifacts, and such objects having intrinsic or historical and archaeological value which have been abandoned on state-owned lands or state-owned sovereignty submerged lands shall belong to the state" with the title to the property vested in the Division of Historical Resources of the Department of State. Fla. Stat. § 267.061(1)(b).  The district court rejected the claim and instead found that the case was "governed by the federal maritime law of salvage, not the Florida Archives and History Act and the regulations promulgated thereunder."  Cobb Coin, 549 F. Supp. at 548 (citation omitted).

18

Some nine years later, Congress enacted the Abandoned Shipwreck Act. The ASA recognizes that "States have the responsibility for management of a broad range of living and nonliving resources in State waters and submerged lands." 43 U.S.C. § 2101(a). Included in that "range of resources are certain abandoned shipwrecks, which have been deserted and to which the owner has relinquished ownership rights with no retention." Id. at § 2101(b). Accordingly, the ASA provides that the United States has title to any abandoned shipwreck that is "(1) embedded in submerged lands of a State; (2) embedded in coralline formations protected by a State on submerged lands of a State; or (3) on submerged lands of a State and is included in or determined eligible for inclusion in the National Register." Id. at § 2105(a). Title to the shipwreck is then automatically "transferred to the State in or on whose submerged lands the shipwreck is located." Id. at § 2105(c). The ASA also states that "[t]he law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 2105 of this title applies." Id. at § 2106(a). Thus, as the Sixth Circuit has recognized, "[t]he ASA expressly rejects the application of the maritime laws of salvage and finds. If a diver now discovers a long-lost ship embedded in the submerged lands of a State, a finding of abandonment leaves the diver with neither title nor a salvage award (unless state law provides otherwise)." Fairport Int'l

19

Expl., Inc. v. Shipwrecked Vessel, 177 F.3d 491, 498 (6th Cir. 1999) (citation omitted).

Gold Hound argues that the codification of the ASA transferred title to the 1715 wreck to the state of Florida and thereby revoked the district court's subject-matter jurisdiction over the res. But this argument fails to account for the limiting language found in § 2106(c), which plainly says that the ASA "shall not affect any legal proceeding brought prior to April 28, 1988." As we have seen, this legal proceeding began on August 17, 1979. See Cobb Coin, 525 F. Supp. at 190. Thus, the ASA does not apply to this dispute, and the passage of that legislation did not deprive the district court of power over the res.

Gold Hound argues, nevertheless, that § 2106(c) does not apply because "the legal proceedings in Cobb Coin have been effectively terminated," "[t]he parties to the initial litigation are no longer in existence," and "the litigation has been artificially prolonged to benefit 1715 Fleet-Queens Jewels." But Gold Hound has not brought a new action against the res; rather, it has attempted to intervene in the same action initiated by Cobb Coin in 1979. The 1715 wreck still provides the basis for in rem jurisdiction because, as we have said, "a site where the remains of a vessel are strewn on the ocean floor is still a shipwreck even if an intact vessel no longer remains." Odyssey Marine, 657 F.3d at 1181 n.15. Finally, Florida's continued consent to the district court's arrangement and its participation in the

20

annual distribution and adjudication process cannot be reconciled with Gold Hound's claim that this dispute has been artificially prolonged to benefit Fleet-Queens.  Whatever else may be unclear, the original 1979 dispute is alive and well, and because it predated the ASA, that Act does not affect the district court's jurisdiction.

## III.

Gold Hound's central argument on appeal is that the district court erred in denying its motion to intervene.  But before we can address the question whether intervention was proper, we must ensure that Gold Hound has standing to pursue this appeal.  See Dillard v. Chilton Cty. Comm'n, 495 F.3d 1324, 1330 (11th Cir. 2007) ("Any party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims.").

The Supreme Court recently answered whether a litigant must possess Article III standing in order to intervene of right under Federal Rule of Civil Procedure 24(a)(2).  The Court first noted the "simple rule" that "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  Town of Chester, N.Y. v. Laroe Estates, Inc., No. 16-605, slip op. at 5–6 (U.S. June 5, 2017).  This principle also extends to intervenors of right: "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right."  Id. at 6.  The

21

Court therefore held that "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." Id.

Here, Gold Hound's intervening complaint seeks a declaration that Fleet-Queens's salvage rights have been extinguished; that, alternatively, Fleet-Queens has abandoned the 1715 wreck, leaving the wreck open to salvage by others; and that the district court no longer has in rem jurisdiction over the 1715 wreck.  This request does not overlap with the relief sought by any other party with standing in this case.  Cobb Coin -- the original plaintiff -- sought title to the 1715 wreck as well as preliminary and permanent injunctive relief enjoining the State from interfering with its ongoing salvage operations.  See Cobb Coin, 525 F. Supp. at 191.  Cobb Coin's successor-in-interest, Fleet-Queens, annually seeks adjudication of title to each year's salvaged artifacts and now seeks to retain its exclusive salvage rights.  And the state of Florida participates in the annual distribution hearings to reserve some of the recovered artifacts for display in its museums.  Plainly, Gold Hound is "pursu[ing] relief that is different from that which is sought by" Cobb Coin, Fleet-Queens, and the State.  Laroe Estates, slip op. at 6.  Indeed, neither Fleet-Queens nor Florida is aligned in any way with Gold Hound in this dispute, and Gold Hound is the only party that has appealed.  Thus, Gold Hound must demonstrate that it has Article III standing to continue this appeal.

22

The well-settled test for establishing Article III standing includes three basic requirements. "First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quotations, citations, and footnote omitted). "Second, the plaintiff must establish a causal connection between its injury and the defendant's conduct. Third, the plaintiff must show that it is likely -- and not merely speculative -- that a favorable decision by the court will redress the injury." Duty Free Americas, Inc. v. Estée Lauder Cos., 797 F.3d 1248, 1271 (11th Cir. 2015) (citing Lujan, 504 U.S. at 560–61).

Gold Hound has sufficiently articulated Article III injury. Gold Hound claims that it suffered (and continues to suffer) an injury because Fleet-Queens unlawfully retains exclusive salvaging rights to a forty-one-mile stretch of Florida coastline, thereby preventing Gold Hound from conducting profitable salvage operations and causing Gold Hound to suffer a substantial loss of livelihood. Gold Hound also claims that Fleet-Queens has damaged or destroyed artifacts in violation of the district court's 1982 order, thereby forfeiting its salvage rights. Gold Hound claims continuous injury because it has not been afforded the opportunity to challenge Fleet-Queens's fitness to salvage and to argue that Gold Hound, instead, should be entitled to the salvaging rights. Finally, Gold Hound's

23

intervening complaint alleged a maritime lien over the recovered artifacts. From the face of the intervening complaint, these claimed injuries are concrete and particularized, actual rather than conjectural, and likely to be redressed by a favorable decision from the district court.

Gold Hound also asserts standing in this case because "an order awarding exclusive rights to conduct salvage is an order 'against the world' and [ ] anyone aggrieved by the order has standing to challenge it." The district court rejected this argument, distinguishing the case that Gold Hound cited for support -- R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 920 F. Supp. 96 (E.D. Va. 1996). In R.M.S. Titanic, a district court in the Eastern District of Virginia awarded "salvor-in-possession status of the RMS Titanic to RMS Titanic, Inc. (RMSTI) and grant[ed] it the exclusive rights over any items salvaged from the RMS Titanic while it remained the salvor in possession." Id. at 97. Just over a year and a half later, John A. Joslyn, a third party, filed a motion pursuant to Federal Rule of Civil Procedure 60(b)[2] asking the district court to rescind its order naming RMSTI the salvor in possession of the Titanic. Id. at 97–98. Although the district court recognized that Joslyn had not been a party to the original action, it concluded that

---

[2] Rule 60(b) addresses grounds for relief from a final judgment, order, or proceeding and says that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for" certain enumerated reasons or for "any other reason that justifies relief." Fed. R. Civ. P. 60(b).

24

he did have standing to file a Rule 60(b) motion because "actions in rem, or 'against the thing,' are designed to adjudicate rights in specific property against all of the world, and judgments in such cases are binding to the same extent."  Id. at 98 (quotations and alteration omitted).  Thus, "[i]t logically follow[ed] that if the whole world are parties bound by the judgment, then the converse should also be true: the whole world are parties who may request relief from the judgment."  Id.

In this case, the district court concluded that "the RMS Titanic case is readily distinguishable from the above-styled action because Titanic was not located in the territorial waters of any state, nor was any state a party to that action."  The district court observed that in this case, Florida has "staunchly asserted the right of the people of the state of Florida to the artifacts recovered from the enjoined areas," and "Florida's appearance and participation as a party to this action has safeguarded the interests of the people of Florida since the very beginning."  These facts were "more than sufficient to distinguish this action from the situation which confronted the court in the RMS Titanic case."

However, the district court cited no case law suggesting that those characteristics -- the location of the wreck or the presence of a state as a party -- have any legal significance.  When the Supreme Court long ago discussed the principle that admiralty actions in rem are against the whole world in The Mary, 13 U.S. (9 Cranch) 126, 144 (1815), it did not reference the location of the vessel or

25

whether any state was involved in the action.  Instead, it broadly proclaimed that "[t]he whole world, it is said, are parties in an admiralty cause . . . therefore, the whole world is bound by the decision"; as a result, "[e]very person may make himself a party, and appeal from the sentence."  Id.

This Court has since recognized the against-the-world nature of orders in in rem admiralty proceedings, and we have not drawn any distinction based on where the res is located or on whether a state was a party to the action.  See, e.g., Thorsteinsson v. M/V Drangur, 891 F.2d 1547, 1553 (11th Cir. 1990) (quoting The Mary and similar cases for the proposition that admiralty actions are against the whole world).  The Second, Third, Fourth, Fifth, Sixth, and Ninth Circuits have said the same thing.  See In re Millennium Seacarriers, Inc., 419 F.3d 83, 93 (2d Cir. 2005) ("The in rem admiralty action, like the in rem adjudication of a bankruptcy estate, establishes title as against the whole world.") (quotations and alteration omitted); Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S., 10 F.3d 176, 179 (3d Cir. 1993); Darlak v. Columbus-Am. Discovery Grp., Inc., 59 F.3d 20, 22–23 (4th Cir. 1995) (quoting Thorsteinsson and The Mary to hold that if a party has claims against the res that forms the subject of an in rem proceeding, he must participate in that proceeding to obtain relief); Merchs. Nat'l Bank of Mobile v. Dredge Gen. G.L. Gillespie, 663 F.2d 1338, 1350 (5th Cir. Unit A 1981) ("An action in admiralty to enforce a maritime lien is not an action against

26

any particular person to compel him to do or to forebear anything; it is an action in rem asserting against the world the claim of a plaintiff to an offending ship.") (quotations omitted); Great Lakes, 522 F.3d at 694 ("It is the court's exclusive custody and control over the property that gives an admiralty court jurisdiction to adjudicate the rights of the salvor against the world.") (quotations omitted); DiGiovanni v. Kjessler, 101 F.3d 76, 78–79 (9th Cir. 1996). These facts do not provide a basis for distinguishing between R.M.S. Titanic and this case. Gold Hound has Article III standing to intervene. The only remaining question is whether intervention was otherwise proper in this case.

IV.

"Our review of the denial of a motion for intervention as of right is de novo." Sierra Club, Inc. v. Leavitt, 488 F.3d 904, 909–10 (11th Cir. 2007). Denial of a motion for permissive intervention is reviewed for an abuse of discretion. Georgia v. U.S. Army Corps of Eng'rs, 302 F.3d 1242, 1249 (11th Cir. 2002).

After the 1966 merger of the Federal Rules of Civil Procedure and the Federal Admiralty Rules, procedure in admiralty cases is governed by both the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Notably, if there is a conflict between the Civil Rules and the Supplemental Rules, the Supplemental Rules control. See Supp. R. A(2) ("The Federal Rules of Civil Procedure also apply to

27

[admiralty or maritime claims] except to the extent that they are inconsistent with these Supplemental Rules."); 2 Am. Jur. 2d Admiralty § 115 (2017) ("The Supplemental Rules for Admiralty or Maritime Claims apply to procedure for admiralty and maritime claims, and the Federal Rules of Civil Procedure are specifically incorporated into [the Supplemental Rules] except to the extent that they are inconsistent therewith.") (footnote omitted); Thomas J. Schoenbaum, Admiralty and Maritime Law § 21-1 & n.6 (2016 ed.).  Thus, "[a]s a result of the unification of admiralty and other civil actions, a district court judge, in considering admiralty claims, may apply all statutory powers, whether deriving from law, equity, or admiralty."  2 Am. Jur. 2d Admiralty § 115.

The Federal Rules of Civil Procedure are, in turn, supplemented by a district court's local admiralty rules, if any have been promulgated.  See Supp. R. A, Advisory Committee Notes -- 1966 Adoption (noting that the Supplemental Rules do not "limit[ ] or impair[ ] the traditional power of a district court, exercising the admiralty and maritime jurisdiction, to adapt its procedures and its remedies in the individual case, consistently with these rules" and that "district courts retain the power to make local rules not inconsistent with these rules"); 2 C.J.S. Admiralty § 86 (2017) ("Each district court, acting by a majority of its district judges, may . . . make and amend rules governing its practice consistent with, but not duplicative of, federal statutes and other rules.").

28

"Intervention in admiralty cases is governed by the Federal Rules of Civil Procedure" -- specifically, Rule 24.  2 Am. Jur. 2d Admiralty § 170; see also Supp. R. C(6), Advisory Committee Notes -- 2000 Amendment ("[A] statement is filed only by a person claiming a right of possession or ownership.  Other claims against the property are advanced by intervention under Civil Rule 24, as it may be supplemented by local admiralty rules.").  The Supplemental Rules do not discuss intervention, but the Southern District of Florida has promulgated additional standards for intervention in in rem admiralty proceedings in its local admiralty rules.  See S.D. Fla. Local Admiralty R. E(2).

In this case, then, Gold Hound's motion to intervene must be measured against both Federal Rule of Civil Procedure 24 and S.D. Fla. Local Admiralty Rule E(2).  After careful review, we conclude Gold Hound has satisfied the requirements of each.  The district court erroneously denied Gold Hound's motion to intervene.

A.

Intervention under Rule 24 can be either as of right or permissive.[3]  If a party is seeking intervention as of right, the district court is required to allow intervention by anyone who files a timely motion and either:

---

[3] The parties did not argue, and the district court did not address, permissive intervention under Fed. R. Civ. P. 24(b); thus, only intervention as of right is at issue on appeal.  Moreover, because we conclude that Gold Hound could intervene as of right, we need not address permissive intervention.  If Gold Hound's motion was timely, then it could intervene either as a matter of right or permissively, because there is no dispute that Gold Hound alleged "a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).

29

(1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a); see also Chiles v. Thornburgh, 865 F.2d 1197, 1213 (11th Cir. 1989) (allowing intervention when (1) the "application to intervene is timely"; (2) there is "an interest relating to the property or transaction which is the subject of the action"; (3) "disposition of the action . . . may impede or impair [the intervenor's] ability to protect that interest"; and (4) that "interest is represented inadequately by the existing parties to the suit").

The district court concluded that Gold Hound's motion to intervene was untimely and otherwise failed to meet the requirements of Rule 24(a).  The court determined that Gold Hound's interest in this action -- a claim to a portion of the artifacts recovered during the 2015 season -- did not require intervention in the case as a whole but rather an appearance at the annual distribution hearing. Moreover, the district court reasoned that "Gold Hound's interest as salvors and citizens of Florida [was] adequately represented since the state of Florida is a party to this suit."

"Although we generally review denial of intervention under rule 24(a) for error, with subsidiary factual findings subject to review for clear error, our review of the district court's determination of timeliness under both rule 24(a) and 24(b) is

30

conducted under the abuse of discretion standard." Meek v. Metro. Dade Cty.,

Fla., 985 F.2d 1471, 1477 (11th Cir. 1993), abrogated on other grounds by Dillard,

495 F.3d at 1332–33.  In considering whether a motion to intervene is timely, we

consider several factors:

> 1. The length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene[;]  2. The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case[;]  3. The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied[;]  and  4. The existence of unusual circumstances militating either for or against a determination that the application is timely.

Id. at 1478–79 (quotations and alterations omitted).

When measured against these standards, the district court abused its

discretion in concluding that Gold Hound's motion to intervene was untimely.  The

length of time during which Gold Hound knew of its interest in the case before

moving to intervene was short.  Although the motion was filed thirty-three years

after the district court's 1982 order, Gold Hound itself did not come into existence

until approximately 2008.  And while the passage of seven years before a motion

to intervene might be untimely, Gold Hound had no reason to intervene in the

action while it was amicably performing salvage services as a subcontractor for

Fleet-Queens.  Even after the contract was terminated, Gold Hound had no

knowledge of its need to intervene until it learned of the 2015 discoveries -- which

31

it alleges were made due to its misappropriated intellectual property. The reason for Gold Hound's intervention -- the September 15, 2015, order setting the date of the 2014 distribution hearing -- arose only two weeks before it sought to intervene.

Moreover, and significantly, the original parties to the action have not claimed any prejudice stemming from Gold Hound's claimed delay, and we can discern none since the distribution hearings proceeded as scheduled without any delay. Gold Hound, however, would be prejudiced (and prejudiced substantially, at that) if intervention were denied because although it was permitted to appear at the 2015 distribution hearing, it was not allowed to raise claims challenging Fleet-Queens's continued rights to the res based on claims of misconduct while carrying out its salvage responsibilities. Intervention in the in rem proceeding would have been the best way for Gold Hound to raise these claims. See Wilson v. Minor, 220 F.3d 1297, 1301 (11th Cir. 2000) ("[I]ntervention pursuant to [Rule] 24 is the appropriate way for an outsider with an interest in an existing lawsuit to come in as a party. Intervention in the original action is also generally the proper mechanism for a nonparty to seek relief from an existing judgment.") (citation omitted), abrogated on other grounds by Dillard, 495 F.3d at 1332–33. As we see it, under these unusual circumstances, it was an abuse of discretion for the district court to conclude that Gold Hound's motion to intervene was untimely.

32

Gold Hound has also satisfied the remaining requirements set forth in Rule 24(a)(2).  Under circuit precedent, "[a]ll that is required under Rule 24(a)(2) is that the would-be intervener be practically disadvantaged by his exclusion from the proceedings."  Huff v. Comm'r of IRS, 743 F.3d 790, 800 (11th Cir. 2014).  As we have detailed, Gold Hound has asserted an interest in the property, having sought a maritime lien and levelled other in rem claims.  Any disposition of this action without allowing intervention would deprive Gold Hound of the opportunity to be heard on those in rem claims.  And while "[t]he proposed intervenor has the burden of showing that the existing parties cannot adequately represent its interest, [ ] this burden is treated as minimal."  U.S. Army Corps of Eng'rs, 302 F.3d at 1255–56 (quotations omitted).  Gold Hound has carried this minimal burden.  Plainly, neither Fleet-Queens nor Florida adequately represents Gold Hound's interests: Fleet-Queens wants to retain its exclusive salvaging rights, while Florida represents the interests of its citizens by securing some artifacts for display in its museums.  Thus, the district court erred in denying Gold Hound's motion to intervene under Rule 24(a)(2) of the Federal Rules.

## B.

Rule 24 is supplemented by the Southern District of Florida's Local Admiralty Rules.  See Supp. R. C(6), Advisory Committee Notes -- 2000 Amendment.  These rules provide additional requirements for intervention beyond

33

the strictures of Rule 24. Local Admiralty Rule E(2) governs intervention in in rem admiralty proceedings, and it distinguishes between intervention as of right and permissive intervention based on whether a sale of the property is currently pending. If there is no sale pending, then intervention as of right is permitted "at any time before an order is entered by the Court scheduling the vessel or property for sale." S.D. Fla. Local Admiralty R. E(2)(a). If a sale is pending, a would-be intervenor is free to intervene more than twenty-one days before the sale. If the pending sale is within twenty-one days, the would-be intervenor must comply with additional procedural requirements, including filing a supplemental warrant of arrest, serving copies of the motion to intervene, and filing a certificate of service with the district court. S.D. Fla. Local Admiralty R. E(2)(b). So long as these requirements are satisfied, the district court may "permit intervention under such conditions and terms as are equitable to the interests of all parties." S.D. Fla. Local Admiralty R. E(2)(b).

Under Local Admiralty Rule E(2), the dispositive issue here is whether a sale was pending when Gold Hound filed its motion to intervene. While there was no order expressly mentioning a sale, the 2014 distribution hearing was scheduled for October 19, 2015, and Gold Hound moved to intervene on September 30, 2015 -- only nineteen days before the hearing. Thus, if an upcoming distribution hearing were equivalent to a pending sale, then Gold Hound could intervene only

34

permissively.  Because it is undisputed that Gold Hound did not comply with the procedural requirements set out in Local Admiralty Rule E(2)(b), Gold Hound's motion would be untimely under the Local Admiralty Rules.  But if no sale were pending, the twenty-one-day limitation would not apply and Gold Hound could, "as a matter of right, file an intervening complaint" at any time before a sale was scheduled.  S.D. Fla. Local Admiralty R. E(2)(a).

No sale was pending in this case.  While the district court had scheduled the 2014 distribution hearing, an order setting a distribution hearing is not the functional equivalent of a sale.  Indeed, the district court never characterized the distribution as a sale, and it never observed Local Admiralty Rules E(16) and E(17) -- governing "Notice of Sale" and "Sale of a Vessel or Property" -- by advertising the sale as required and accepting bids for the artifacts.  Instead, the notices referenced only "[a]djudication of [t]itle" and "potential claimants to the artifacts."  The word "sale" and any equivalent terms were never mentioned in the notices.  Rather than effect the sale of artifacts, the district court merely adjudicated title between the state of Florida and Fleet-Queens and distributed the artifacts in accordance with that adjudication.  Thus, no sale was pending for the recovered artifacts and Gold Hound could intervene as of right under Local Admiralty Rule E(2)(a).

35

Moreover, even if an order scheduling a distribution hearing were tantamount to a pending sale, this timeline would preclude claims pertaining to only the 2014 salvage season.  At the time Gold Hound moved to intervene, Fleet-Queens's 2014 motion for distribution was pending and the 2014 distribution hearing was only nineteen days away.  Treating an upcoming distribution hearing as a pending sale would thus make the 2014 claims untimely.  But it is undisputed that the 2015 season's distribution process had not yet begun.  The motion for distribution regarding the 2015 season was filed on February 12, 2016, which was well after Gold Hound's September 2015 motion to intervene.  In compliance with its procedures, the district court issued a notice for the distribution hearing and advertised the hearing in the local newspaper.  Both notices required that "[a]ny and [a]ll potential claimants to the artifacts must file their claim with the United States District Court at least ten (10) days prior to the date of the hearing."  Gold Hound timely filed its claim to the 2015 artifacts on March 4, 2016 -- twelve days before the 2015 distribution hearing.  Thus, Gold Hound's claim and motion to intervene were timely for the 2015 season.

In short, because Gold Hound fully satisfied the requirements for intervention found in the Federal Rules of Civil Procedure and in the Southern District of Florida's Local Admiralty Rules, the district court erred in denying Gold Hound's motion to intervene.

36

C.

Gold Hound should have been allowed to intervene in this in rem proceeding.  However, that a would-be intervenor has a sufficient interest for some issues in a case does not necessarily mean that it has an interest in all of the issues, so the district court "may limit intervention accordingly."  United States v. S. Fla. Water Mgmt. Dist., 922 F.2d 704, 707 (11th Cir. 1991).  As we have explained, Gold Hound alleged several claims that go to the core of the in rem action.  Gold Hound also levelled several supplemental state-law contract claims against Fleet-Queens.  We express no opinion about whether these claims are more properly heard in the in rem proceeding or in an independent in personam action between Fleet-Queens and Gold Hound.  We note, however, that these claims are now pending in a related action in Florida state court.  See 1715 Fleet-Queens Jewels, LLC v. Gold Hound, LLC, Case No. 31-2015-CA-828 (Fla. Cir. Ct. filed Oct. 21, 2015). We leave it for the district court to decide, on remand, whether and if so, how to exercise supplemental jurisdiction over Gold Hound's nonadmiralty claims.

V.

Gold Hound also contends that it has a maritime lien over the artifacts recovered during the 2015 salvage season because Fleet-Queens made those recoveries using Gold Hound's proprietary maps, software, and data.  The district court rejected this claim, concluding that "Gold Hound's allegations may be

37

sufficient to support a new, separate action for damages, but they are insufficient to maintain a claim of a superior salvage right to the Defendant wreck than that which is possessed by [Fleet-Queens]." We think the district court was too quick to reject Gold Hound's claims. As we see it, basic factual issues must be resolved in order to make this determination, and, therefore, we remand to the district court for an examination of whether and to what extent Gold Hound provided salvage services that contributed to the recovery of the 2015 artifacts.

"We review the factual findings of a district court sitting without a jury in admiralty under the clearly erroneous standard, and its conclusions of law de novo." Dresdner Bank AG v. M/V Olympia Voyager, 463 F.3d 1210, 1214 (11th Cir. 2006). Whether a party's claims give rise to a maritime lien is a legal question that is reviewed de novo. Myers v. Am. Triumph F/V, 260 F.3d 1067, 1069 (9th Cir. 2001).

"A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim, and it attaches the moment the debt arises." Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864, 868 (11th Cir. 2010) (quotations omitted). The Federal Maritime Lien Act, Pub. L. No. 100-710, 102 Stat. 4735, 4748–49 (1988), codified as amended at 46 U.S.C. § 31341–43, "grants maritime liens to particular persons based on their relationship to, or service of, a vessel." Crimson Yachts, 603 F.3d at 868. Significantly, "[t]he performance of

38

salvage services, like the furnishing of other services to a ship, gives rise to a maritime lien." Treasure Salvors, 640 F.2d at 567.

Maritime liens arising from salvage services presume that the claimant participated in the salvage of the property at issue. See The Sabine, 101 U.S. (11 Otto) 384, 386 (1879) ("Salvors, under the maritime law, have a lien upon the property saved, which enables them to maintain a suit in rem against the ship or cargo, or both where both are saved in whole or in part.") (emphasis added). This is due, in large part, to the risky nature of salvaging; salvage awards and salvage liens are intended to compensate salvors for undertaking those risks and to incentivize others to do the same. See The Blackwall, 77 U.S. (10 Wall.) 1, 14 (1869) (describing a salvage award as "a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property"); Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion, 773 F.2d 1528, 1535 (11th Cir. 1985) ("[T]he principle of salvage rewards a salvor of property in peril with a maritime lien in that property in an attempt to induce rescue.").

However, a claimant need not actually salvage the property in order to be entitled to a maritime lien based on salvage services. As the Supreme Court long ago said, "all who engaged in the [salvage] enterprise and materially contributed to the saving of the property, are entitled to share in the reward which the law allows

39

for such meritorious service, and in proportion to the nature, duration, risk, and value of the service rendered." The Blackwall, 77 U.S. (10 Wall.) at 12. In this case, Gold Hound does not claim that it actually salvaged or recovered any of the artifacts at issue in the 2014 or 2015 distribution hearings. Instead, Gold Hound argues that it materially contributed to the salvage by creating proprietary maps and models that Fleet-Queens misappropriated and then used to salvage the artifacts at issue. Because Gold Hound contributed to the salvage by creating these maps, it argues it is entitled to a maritime lien over the recovered artifacts.

In support of this theory, Gold Hound relies on Darlak v. Columbus-Am. Discovery Grp., Inc., 59 F.3d 20 (4th Cir. 1995). In Darlak, the plaintiff was a researcher who, along with a team of surveyors, took part in an expedition that was looking for the S.S. Central America. Id. at 21. When the Central America was later found by the Columbus-America Discovery Group, the surveyors intervened in the in rem proceeding and argued that they deserved a share of the salvage award because Columbus-America had relied on the surveyors' data. Id. Researcher Joseph W. Darlak was not part of that case, but he later brought a separate action arguing that he, too, was entitled to a portion of the salvaged res because Columbus-America relied on his coordinates. Id. at 22. The district court granted summary judgment for Columbus-America. Id. at 21. The Fourth Circuit affirmed, but it noted that "[i]f Columbus-America . . . had indeed availed [itself]

40

of information proprietary to Darlak to find the [wreck], Darlak would have undoubtedly deserved a salvage award.  However, the time and place to present that claim was in the <u>in rem</u> proceeding, where all salvage awards are determined." <u>Id.</u> at 23.[4]  Because Darlak did not participate in the <u>in rem</u> proceeding and instead brought his own separate suit, his claims failed.  <u>Id.</u>

In this case, Gold Hound did appear in the <u>in rem</u> proceeding to assert a maritime lien based on its intellectual property.  However, the district court treated Gold Hound's claim as a separate contract action against Fleet-Queens.  The district court thus denied the claim without considering whether Gold Hound's services -- creating proprietary maps and models for the purpose of salvaging the 1715 wreck -- might have contributed to Fleet-Queens's recovery of the artifacts. If the maps did contribute to the recovery, then Gold Hound might have been entitled to a maritime lien.  <u>See</u> <u>The Blackwall</u>, 77 U.S. (10 Wall.) at 12 ("[A]ll who engaged in the enterprise and <u>materially contributed to the saving of the property</u>, are entitled to share in the reward.") (emphasis added).  And while <u>Darlak</u> is not binding on this Court, it is persuasive that the Fourth Circuit thought that Darlak "would have <u>undoubtedly</u> deserved a salvage award" had the salvors

---

[4] In the earlier proceeding between the surveyors and Columbus-America, the district court concluded that Columbus-America had not relied on data from the original team of researchers, of which Darlak was a member.  <u>Darlak</u>, 59 F.3d at 21 n.2.  Darlak was not a party to that proceeding.  Because the district court concluded that Darlak's absence from the <u>in rem</u> proceeding was fatal to his claims, the earlier factual finding had no bearing on his separate case. <u>Id.</u> at 23.

41

availed themselves of his proprietary information -- in that case, the search coordinates that he had researched and developed.  Darlak, 59 F.3d at 21 (emphasis added).

Gold Hound's services and proprietary information may likewise have materially contributed to the recovery of the 2015 artifacts, and Gold Hound properly attempted to bring those claims in the in rem proceeding.  Whether Fleet-Queens relied on Gold Hound's proprietary maps and models, and the extent to which those maps and models may have contributed to the recovery of the artifacts, are factual questions that profoundly affect whether Gold Hound is entitled to a maritime lien.  We, therefore, remand this issue to the district court for a determination in the first instance.

## VI.

On appeal, Fleet-Queens moved for sanctions against Gold Hound for filing frivolous appeals under Federal Rule of Appellate Procedure 38.  We decline to impose sanctions on Gold Hound.  For starters, Fleet-Queens's motion for sanctions is untimely.  Eleventh Circuit Rule 38-1 says that "[m]otions for damages and costs pursuant to FRAP 38 must be filed no later than the filing of appellee's brief."  In this case, appellee's brief was filed on July 12, 2016.  Appellee's motion for sanctions was filed on August 4, 2016.  Thus, Fleet-Queens's motion was untimely.

42

Moreover, even if the motion were timely, sanctions would not be appropriate. Appellate Rule 38 provides that "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." In this Circuit, "Rule 38 sanctions have been imposed against appellants who raise clearly frivolous claims in the face of established law and clear facts." Farese v. Scherer, 342 F.3d 1223, 1232 (11th Cir. 2003) (quotations omitted). "For purposes of Rule 38, a claim is clearly frivolous if it is utterly devoid of merit." Parker v. Am. Traffic Sols., Inc., 835 F.3d 1363, 1371 (11th Cir. 2016) (quotations omitted). But it was well within Gold Hound's right to appeal the denial of its motion to intervene. See Fox v. Tyson Foods, Inc., 519 F.3d 1298, 1301 (11th Cir. 2008) ("Although orders denying a motion to intervene are not final orders, under the 'anomalous rule' we have provisional jurisdiction to determine whether the district court erroneously concluded that the appellants were not entitled to intervene as of right under [Rule 24(a)]."). The fact that Gold Hound has succeeded on some of its arguments strongly suggests that its appeal was not frivolous.

## VII.

Finally, Fleet-Queens has filed a "notice of pendency" of a related action and informed the Court that we "may take judicial notice of the pendency in the

43

State Court of [a] related action." Fleet-Queens has provided notice but has not asked for any relief related to this notice. As of the date of this opinion, this action is pending without adjudication. See 1715 Fleet-Queens Jewels, LLC v. Gold Hound, LLC, Case No. 31-2015-CA-828 (Fla. Cir. Ct. filed Oct. 21, 2015). The district court may wish to consider the posture of the state court proceeding as it determines whether (and to what extent) it may exercise supplemental jurisdiction over Gold Hound's state-law claims.

We commend the district court for its dedication to the fair adjudication of title and the resolution of disputes arising from this centuries-old shipwreck. The district court properly determined that it had and continues to have subject-matter jurisdiction over the res. Under the circumstances of this case, however, we conclude that it was error to deny Gold Hound's motion to intervene, at least regarding Gold Hound's in rem claims. On remand, the district court should determine whether it will exercise supplemental jurisdiction over Gold Hound's remaining claims. As for Gold Hound's assertion of a maritime lien, we conclude that critical facts remain in dispute and, accordingly, we cannot reach a conclusion regarding the merits of this claim. We also deny Fleet-Queens's motion for sanctions. We, therefore, VACATE the denial of Gold Hound's motion to

44

intervene and REMAND this case to the district court for further proceedings consistent with this opinion.

VACATED and REMANDED.